UNITED STATES of America, Plaintiff,

v.

**FIRESTONE TIRE & RUBBER COMPANY, Defendant.**

Civ. A. No. C79–479A.

United States District Court,
N. D. Ohio, E. D.

July 15, 1981.

Solomon Oliver, Dale F. Kainski, Asst. U. S. Atty., Cleveland, Ohio, for plaintiff.

John M. Glenn, Akron, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

CONTIE, District Judge.

Invoking the Court's jurisdiction under 28 U.S.C. §§ 1345 and 1355, the United States Attorney for the Northern District of Ohio commenced the above captioned case for violations of the implementing regulations promulgated by the Secretary of Treasury under the authority of section 3 of the Gold Reserve Act of 1934,[1] 48 Stat. 337. The Government alleges that defendant, through a wholly owned foreign subsidiary, acquired and held gold in violation of 31 C.F.R. § 54.14(a) (1974).[2]

Prior to the filing of the Government's complaint, Congress repealed all restrictions on the acquisition and holding of gold. Pub.L. No. 93–110, § 3, 87 Stat. 352 (1973); Pub.L. No. 93–373, § 2, 88 Stat. 445 (1974). The within action is preserved and maintained by virtue of 1 U.S.C. § 29 and Executive Order No. 11,825 (issued January 6, 1975). Relying upon section 4 of the Gold Act, the Government seeks to recover statutory penalties in the amount of twice the value of the subject gold. The case was tried without a jury, and the following shall constitute the Court's findings of fact and conclusions of law. See Fed.R.Civ.P. 52(a).

### I.

Defendant, The Firestone Tire & Rubber Company (Firestone), is an international diversified manufacturer, with production facilities and sales operations throughout the world. Firestone's principal business centers on the development, manufacture and marketing of tires for all types of vehicles in the United States and abroad.

Firestone's executive committee is the principal operating body for the corporation and has the power to act for the board of directors in the absence of a board meeting. The executive committee is comprised of members of the board of directors, and the chairman of the board of directors is generally placed in charge of the executive committee. Its primary duty is to consider proposals for capital investments, and present those items receiving preliminary approval to the board of directors for finalization. The executive committee routinely convenes once a month, but could be convened at any time by the chairman to deal with exigent circumstances.

In 1968 Firestone floated a Euro dollar public bond issued in the amount of $60,-000,000. The bond was offered in Euro dollars so that the proceeds could more readily be maintained abroad for foreign investment. A corporate vehicle was needed both to manage and invest the proceeds from the Euro dollar bond, and to serve as a facility for coordinating Firestone's affairs in the international market. Also, a policy decision was made to minimize the risk of loss from exchange rate exposure by using foreign currencies in overseas capital funding projects. To perform these functions Firestone's executive committee approved the formation of the Firestone Finanz Company, which was a wholly owned subsidiary, incorporated as an investment company in 1968 in Zurich, Switzerland.

From 1937 until his retirement in 1976 Robert P. Beasley was employed by Firestone. In 1968 he rose to the position of executive vice president of finance and served as a member of both the board of directors and the executive committee. During the 1960's Beasley had worked on Firestone overseas projects with Kishore Premchand, a European educated investment advisor. Premchand's abilities favorably impressed Beasley, and, when Firestone decided to form Firestone Finanz,

---

1. Hereinafter referred to as the "Gold Act."

2. All citations for the Code of Federal Regulations are made to the 1974 edition.

Premchand was retained upon Beasley's recommendation to set up and to manage the Swiss investment company. In addition to his role as the chief operating officer of Firestone Finanz, Premchand served as an investment advisor to Firestone on matters affecting the company's overseas operations.

As a finance company, Firestone Finanz could not engage in many areas of Swiss commercial banking. A finance company could not increase its business beyond a certain point or trade on the Zurich stock exchange. Also, Swiss banks occupy a beneficial status in transacting business with each other. The management of Firestone Finanz had former clients who desired financial services available exclusively through a Swiss bank. For these reasons Premchand suggested that Firestone should transform Firestone Finanz into a Swiss bank.

In 1971 Firestone Finanz was converted into Bank Firestone, a full service commercial bank, licensed under Swiss law and located in Zurich. Bank Firestone was organized as a wholly owned subsidiary of Firestone. The proposal for the conversion was taken to the executive committee by Beasley. Firestone Finanz had a successful record and Firestone approved a $5,000,000 capital infusion and authorized Premchand to secure a Swiss banking license.

Three members were appointed to Bank Firestone's board of directors: Premchand; Werner Strohmeier, Premchand's long-time business associate; and Hans Hussy, a Swiss attorney. Hussy had performed legal services for Firestone on the incorporation of Firestone Finanz and agreed to serve as a director of Bank Firestone. Approximately five managers and assistant managers conducted the day-to-day operations of the bank under the direction of Premchand. Glenn H. Glad, who had worked for Firestone or one of its subsidiaries since 1963, joined the bank as a manager.

Glad had worked for Firestone Finanz and was employed by the bank until its liquidation in 1976. Premchand solicited Beasley's recommendation for someone who could be brought in to learn the Swiss banking business and take charge of Bank Firestone when Premchand eventually retired. Glad was recommended and Premchand hired him as a bank manager. Glad's managerial responsibilities were administrative, and included preparing accounting entries for business transactions, financial and expense control statements, and reports to the Swiss fiscal and banking authorities.

Swiss banking law requires as a prerequisite both to obtaining and to maintaining a banking license that the bank's management is competent and totally independent from its shareholders. The directors must be approved by the Swiss federal government and a majority of the board must be Swiss citizens. Any attempt by the shareholders to exercise control over the bank would constitute a violation of Swiss law. Furthermore, control by the shareholders over the directors of the bank would be counterproductive as the directors are under a legal obligation to maintain their independence. For this reason it would be difficult to find competent directors who would submit to domination by the shareholders.

The situation is not significantly altered by the sole shareholder status of a Swiss bank's parent corporation. Even if accommodating directors are available, the sole shareholder cannot oust the incumbent directors without holding a shareholders' meeting in accordance with Swiss corporate law and banking law. A formal shareholders' meeting must be called in compliance with all legal prerequisites, including minimum notice, and a resolution must be properly passed. A director of a bank must be a shareholder under Swiss law and can refuse to participate until a properly noticed shareholders' meeting is called in compliance with all Swiss legal formalities.

The Federal Banking Commission is charged by the Swiss federal government with responsibility of enforcing the banking laws in Switzerland. In discharging its duties, the commission relies upon the services of approved accounting firms. The auditing firms perform two separate functions.

As a "company law auditor," the accounting firm is responsible to the shareholders of the bank and certifies that the financial position of the bank complies with the legal requirements as to valuation. This is necessary because Swiss banking secrecy precludes the shareholder from gaining access to any detailed financial records of the bank. The company law audit contains only a balance sheet describing in very general terms the bank's assets and liabilities. The audit further certifies that the balance sheet is accurate and that the bank has kept proper books and records.

As a "bank law auditor," the accounting firm is responsible for verifying that there is full compliance with the extensive banking regulations, including the requirement of minimum liquidity. The primary function of the bank law auditor is to insure that the bank operates within the letter and spirit of Swiss law. It is the duty of the bank law auditor to advise the Swiss Banking Commission of any infractions of Swiss law, and to monitor the situation until the infractions are remedied. Any evidence of a failure of the bank management's independence from shareholder control is subject to comment in a section of the audit dealing with maintaining the conditions under which the banking license was issued.

The board of directors of the bank must select an auditor from the list approved by the Federal Banking Commission. Price-Waterhouse & Company performed both as Bank Firestone's company law auditor and bank law auditor from its formation until its liquidation. No adverse comment on the independence of the bank's management was made in the audits prepared by Price-Waterhouse & Company in the capacity of a bank law auditor.

During his tenure as chairman of Bank Firestone, Premchand served a dual role. He had complete responsibility for operating the bank. Additionally, he acted as an advisor available to anyone in Firestone's financial division for consultation on Firestone's overseas operations. Premchand spent 60% of his time performing the advisory function.

Bank Firestone maintained a greater degree of independence from its parent than any other Firestone subsidiary. To comply with Swiss banking regulations, the bank maintained a completely different set of accounting and reporting procedures. As chairman and managing director, Premchand reported only on the bank's general financial position by submitting to Firestone monthly balance sheets, profit and loss statements, and annual budgets of income and expenditures.

Bank Firestone was operated as an autonomous entity, a full subsidiary over which Premchand had complete authority. His independence from the parent was both a requirement of Swiss banking law and a condition precedent to his acceptance of the position as chairman of the bank. Firestone had no knowledge, information, control or supervision over the day-to-day operations and policy decisions of the bank.

The line of communication between Bank Firestone and Firestone ran between Premchand and either Beasley or Kenneth W. Reese. Reese began his employment with Firestone in 1957 and served as treasurer from 1970 to 1975. In his position as treasurer Reese reported to the executive vice president of finance, Beasley.

On matters relating to the bank's budget, which would fall within the normal treasury affairs of Firestone, Premchand would contact Reese. If some facet of the bank's operation required approval of Firestone's executive committee, Premchand's communications were appropriately directed to Beasley in his role as a member of the executive committee.[3] Because of the reporting relationship between Reese and Beasley, availability would often determine who Premchand would contact.

3. For example, in January of 1971 the executive committee considered and approved a proposal to open a branch of Bank Firestone in London. Premchand presented the request to Beasley who, as chief financial officer and an executive committee member, brought the recommendation to the executive committee for consideration. The proposal was never consummated and the plan was ultimately aborted.

In his role as an advisor, Premchand would communicate to Reese on issues involving the financing of Firestone's overseas operations. For example, if Firestone required capital to finance a European commercial venture Reese would secure Premchand's advice on whether Firestone should borrow in German marks or Swiss francs. Premchand would occasionally contact Reese with foreign investment advice. He might suggest that Firestone should take a hedge contract in a foreign currency to make payment in the future upon the delivery of a foreign capital investment such as machinery. Premchand's expertise was also valuable to Reese in discharging his responsibility over coordinating Firestone's debt financing in dozens of different currencies and exposure to exchange rate fluctuations in fund transfers between parent and subsidiaries.

Premchand and Strohmeier traveled to Akron on occasion at Firestone's invitation to meet the management on a social level. Bank Firestone's management would reciprocate the social amenities when Firestone personnel would visit Zurich while on business in Europe. At no point during the business or social contacts between the managements of Firestone and its subsidiary bank did Firestone officials attempt to give directions to Premchand on any aspect of the operation of the bank. He was recognized by the management as the expert in the area of Swiss banking and foreign investment.

Bank Firestone was a wholesale bank functioning as any other Swiss commercial bank. The bank offered the following services: investment advisory management, advice on financing companies in various foreign countries, placing deposits in the Euro-currency market, current and time deposits, foreign exchange, and Euro-currency loans. A minimum deposit of 10,000 francs was required to open an account at Bank Firestone. The bank's income consists of profits in the form of investments and commissions.

Investment profits are generated by Swiss banks in two different ways. First, a permanent investment may be taken by holding a participation. Second, the bank may purchase bonds, a block of shares, or units in a trust to sell when the market goes up. Similarly, Swiss banks speculate in the market fluctuations in exchange rates by entering into currency exchange contracts.

Swiss banks earn commissions by performing a broker function and executing transactions in securities on behalf of clients. There are no securities brokers in Switzerland. Rather, Swiss banks act as brokers in securities upon obtaining a license. Bank Firestone secured such a license. Commissions are also made on the execution of transactions in precious metals for the account of clients.

It is a common practice for Swiss banks to hold a beneficial interest in a shell subsidiary operated by the bank's own management and for the bank's benefit. The relationship is structured so that legal ownership of the subsidiary cannot be traced back to the bank. Exactly how the shell subsidiary fits into the particular business practices of a Swiss bank is considered a business secret. It is not disclosed because the bank seeks to prevent outsiders, especially the competition, from understanding its internal operations.

There are some more common uses for these subsidiaries that are matters of general knowledge in the Swiss banking industry. Major participations and large blocks of shares can be purchased without inflating the market price by concealing within the subsidiary the interest of the bank or its client. Short and long positions in foreign currencies, prohibited under Swiss law, can be transferred to the subsidiary at the end of the business day. There is nothing improper or uncommon about these practices, and the variety of ways in which the subsidiary can be used is limited only by the ingenuity of the bank's management.

Bank Firestone also used wholly owned shell subsidiaries in its banking business. At the request of Premchand, in 1972 Hussy provided legal services for the purchase on behalf of Bank Firestone of the Alps In-

vestment Co., Ltd., Curacao. The company was a mere shell without assets. The shares of Alps Curacao were bearer shares held by Omniconsult A.G., a Swiss corporation controlled by Hussy. Hussy prepared in favor of Bank Firestone an option agreement and supplement trust agreement for the Alps Curacao shares held by Omniconsult. The option agreement and supplemental trust agreement reposed in the bank the beneficial ownership of Alps Curacao. Legal title to the bearer shares of Alps Curacao was held by the trust company, Omniconsult. In this way Bank Firestone maintained beneficial ownership and control of Alps Curacao without direct legal ownership, which might result in disclosure.

Alps Curacao was both a subsidiary and client of Bank Firestone. As a subsidiary, the bank utilized Alps Curacao to transact business by facilitating customer transactions in stock, foreign exchange contracts, and gold claims. As a client, the subsidiary gave in favor of the bank a form of authority to manage its assets.

Because there was no double tax treaty between Curacao and Switzerland, the resulting tax burden made Alps Curacao an inappropriate vehicle for facilitating bank business. Panama has no tax on corporate profits. Thus, after consultation with Premchand, Hussy incorporated a Panamanian corporation: the Alps Investment Co., Inc., Panama. An option agreement and supplemental trust agreement were executed by Omniconsult, which also held the bearer shares of Alps Panama. Alps Curacao and Alps Panama were functionally interchangeable. Each was used to facilitate client transactions and was also a client of the bank. Legal title to both reposed in the bearer shares held by Omniconsult, with the bank maintaining equitable ownership in the companies. Hussy served as a director of Bank Firestone and a director of both Alps companies.[4]

The obligatory gold claim on metal account is one of the types of transactions in precious metals executed by Swiss banks on behalf of their clients. It is a contractual duty on the part of the seller to procure and deliver on the maturity date, or on demand if there is no maturity date, the quantity of gold reflected in the claim. The value of a gold claim is determined by the market value of the amount of gold expressed therein.

The value of the gold stated in the claim fluctuates exactly parallel to the market price of gold. The customer is interested in an investment guaranteed by a gold clause. When the customer decides to get out of the gold market the gold claim is merely liquidated at its market value, which is offset against the parallel price at the time of purchase and results in either a credit or debit to the client's currency account. The customer does not sell gold, but sells the gold claim.

Bank Firestone facilitated a large number of transactions in gold claims on behalf of its clients. The customer would place his order with the bank, generally in an amount not less than 2,000 ounces nor more than 10,000 ounces. The bank official handling the transaction would then contact one of the member banks of the Zurich gold pool for a price quote.

The Zurich gold pool has a bid price at which it will buy and an offer price at which it will sell. Major purchasers are permitted to buy gold claims from the Zurich gold pool at a price in between the bid and offer prices. As a condition precedent to receiving the favored price, the institutional purchaser is obliged not to pass the discount on to the customer. This requirement protects the Zurich gold pool from competition by its large institutional clients.

Most Swiss banks satisfy the requirement by running the transaction through a nominee, which is generally a solely owned subsidiary. In the case of Bank Firestone, it would sell the gold claims to Alps at the favored price. In contemporaneous transactions Alps would sell the gold claims back to Bank Firestone at the offer price, and Bank Firestone would then sell the gold claims to the customer at the offer price.

---

4. Alps Panama shall be hereinafter referred to simply as Alps.

Bank Firestone charged its customers the standard Zurich commission on the transactions in gold claims. Alps charged no commission, but profited from the price differential it captured.

The purchase of gold claims would be documented for the customer in the following fashion. The customer's currency account would be debited for the purchase price, and the amount of gold specified in the claim would be credited to the customer's metal account, which is denominated as a "safe custody account" in Bank Firestone's documentation of the transactions. All customer transactions were financed either by funds on deposit or monies loaned to the customer by the bank.

As collateral for a loan, the customer pledged to the bank the assets of the customer held by the bank. These assets included any gold claims credited on the customer's metal account. The pledge is evidenced by a written instrument and gives the bank the authority to sell the client's assets if the loan falls in default. Thus Bank Firestone held gold claims as collateral for loans made to its customers.

Neither Bank Firestone nor Alps ever maintained any position in gold claims for its own account. It was not uncommon for Alps, however, to have residual gold claims left in its account following the day's transactions. This residual constituted on the average five to ten percent of its daily turnover, or 8,000 to 10,000 ounces. It was necessary to maintain a residual because there is no trading in the Zurich gold pool in the morning or afternoon while the London price fixing is taking place, nor can trading occur after 4:30 p. m.

A residual of gold claims on the books of Alps was necessary to accommodate customer orders during the periods that the Zurich gold pool was closed. To accept purchase orders without ready access to the gold claims would constitute selling short, which is speculation of a type admonished by the Federal Banking Commission. The residual would generally be held over night, and in no case would it take longer than ten days to turn over completely the residual gold claims.

Prior to April, 1974, Firestone's management had scant knowledge of the operation of the Alps subsidiaries. It was expressed to Firestone by Bank Firestone that the use of subsidiaries was a common practice in the Swiss banking fraternity, and Firestone acquiesced in Bank Firestone's formation and use of such subsidiaries. Firestone's attitude was that Premchand, by virtue of Swiss banking law and his unique expertise, had the authority to run the bank at his own discretion.

Firestone also had a general knowledge that such subsidiaries could be utilized to conceal the true ownership of investments. Firestone had a minority interest in a Spanish company that it sought to increase in an undisclosed fashion. Its desire was accommodated by the bank, as would any other customer's desire to have stock held in the name of one of the bank's subsidiaries. The stock would remain in the subsidiary until the customer provided written authorization for transfer of ownership.

Firestone was also aware of the transactions in precious metals that Swiss banks facilitated on behalf of their customers. So much of Bank Firestone's day-to-day operations was clothed with secrecy under Swiss law, that Firestone's management could do little more than transmit the U. S. gold regulations to Bank Firestone, request that the bank stay within the letter of the law, and suggest that other U. S. owned Swiss banks be consulted on any grey areas.

Richard A. Riley began working for a Firestone subsidiary in 1939 as an accountant. From 1972 to 1976 he held the position of president of Firestone. In 1973 Riley visited Bank Firestone during a European tour of Firestone's overseas subsidiaries. Riley inquired of Premchand when Firestone's internal audit department had last conducted an audit of the bank. Premchand responded that Bank Firestone had never been audited by its parent.

Upon his return to Akron, Riley arranged to have the Firestone internal audit group include Bank Firestone in its next Europe-

an assignment. The bank had not previously been subject to the routine examinations of the internal auditors because Swiss banking law prohibits disclosure of the bank's records. Notwithstanding the restrictions that inhibited a complete audit, Riley desired an audit that would at least verify that the bank was utilizing competent internal controls and procedures. Within the Akron management, there was also concern over the nature of Bank Firestone's involvement in the precious metals market.

The audit was conducted in February, 1974. Under Swiss secrecy laws, the names of customers were not disclosed to the Firestone auditors and a complete analysis and verification of bank accounts was not possible. Over 90% of Bank Firestone's business was generated by clients other than Firestone. Thus it was impossible to conduct a complete audit. From the information available, the auditors concluded that the bank did not purchase gold claims on its own account, although it did trade on behalf of clients.

James M. Denny is an attorney who began working in 1968 as an assistant counsel for Firestone's law department. In 1971 he became the assistant treasurer of Firestone. In April, 1974, Denny was returning to the United States from Germany where he was involved in a Firestone acquisition of a small company. While changing flights in Zurich, Denny met with Premchand to discuss the acquisition. During the conversation Premchand requested that Denny initial a document relating to Alps.

Premchand explained his purpose for the request: Hussy desired to document Firestone's acknowledgement that the assets in Alps were held for the benefit of the bank, and not his own benefit. Denny inquired into the business of Alps and Premchand responded by presenting a recent position statement of the subsidiary's assets and liabilities.

The position statement reflected that various forms of gold were included among the subsidiaries' assets. The volume and forms of gold entered on the Alps position statements were accounting entries corresponding to the total quantities of the various types of gold reflected in gold claims. Denny did not initial the document because he was uncertain as to its implications and he felt that it was not prudent for any Firestone official to initial a document indicating a position in gold.

Upon his return to Akron, Denny met with Reese and conveyed to him the substance of the initialing incident in Zurich. Reese solicited Denny's opinion on the situation. Denny suggested that an investigation should be conducted to determine whether the bank was in violation of the U. S. gold regulations.

Reese immediately relayed the incident to Riley. A meeting on the situation was then convened between Riley, Beasley, and Reese. It was decided that Reese should travel to Europe and conduct an investigation, because the Firestone management in Akron was not in a position to satisfy itself that Bank Firestone's precious metal transactions were in full compliance with the U. S. gold regulations.

Reese conducted two fact-finding missions. During both trips he met with Premchand and Hussy. The first meeting was in Zurich and the second meeting was in London. After returning to Akron from each fact-finding mission, Reese reported to Riley and Beasley. There were two overriding issues that focused both the fact-finding missions by Reese and the subsequent meetings in Akron. The primary concern was the scope and nature of Firestone's activity in the precious metals markets. There was also interest in Premchand's announcement that he wished to offer his resignation and retire from the bank.

Firestone was prevented by the Swiss secrecy laws from gaining specific information regarding Alps and its transactions in gold. Reese was generally informed by Hussy that Alps was used by Bank Firestone as a holding company and in a capacity that was customary in the Swiss banking practice. The inability to obtain hard facts on the bank's precious metal transactions and the possibility of infractions under the

U. S. gold regulations caused Firestone's management to strongly request that the bank cease using Alps to engage in the transactions.

Premchand readily agreed to stop utilizing Alps. It was not an integral aspect of the bank's day-to-day operations and he was sensitive to Firestone's concern that there may be some impropriety associated with the transactions in gold claims. All activity in Alps was halted, with the exception that outstanding transactions and contracts were completed. Premchand disposed of the residual gold claims on the market at his professional discretion, and eventually Alps was liquidated. The profits in Alps generated by the transactions in gold claims were transferred to Bank Firestone when the subsidiary was liquidated.

During this period Premchand announced his decision to retire in six months. Advance notice is required under Swiss law so that there is an opportunity to retain a competent substitute. Premchand decided to leave the bank because he was looking toward retirement and less responsibility than attached to his position as chairman of Bank Firestone. The numerous inquiries by Firestone into the confidential operations of the bank was a marginal factor affecting the timing of his decision.

In both July, 1974, and January, 1975, potential losses on foreign exchange contracts held by Bank Firestone threatened to impair the bank's capital. Under the regulations of the Swiss Federal Banking Commission, the magnitude of the potential impairment could force the bank to close. A failure by Bank Firestone would reflect unfavorably upon Firestone. Thus in each case Firestone offered to intercede and, along with Bank Firestone's management, work toward a solution.

The first incident involved future exchange contracts, between Bank Firestone and the Herstadt Bank, both for the purchase and the sale of deutche marks. Immediately prior to closing its doors due to financial difficulties, the Herstadt Bank charged or debited Firestone's account for thirty million francs through the clearing agent. The Swiss Bank Corporation was used for clearing the exchange contracts, but it did not credit Bank Firestone for a sale to Herstadt which was on the same day and had the same maturity date. This put Bank Firestone in a substantial overdraft position. Failure to clear an overdraft position means a Swiss bank cannot open the next day.

Firestone initiated legal action in the United States against the Swiss Bank Corporation. Beasley traveled to Zurich to work along with Premchand, Strohmeier, Hussy, and Swiss banking officials. Ultimately Bank Firestone was able to recover twenty-eight million francs.

The second incident arose out of the failure of Finabank. At the time of the failure, Bank Firestone had open exchange contracts with Finabank and stood to suffer a potential loss of approximately twenty-two million francs. Premchand notified Firestone's management of the problem. Denny had experience in the area and traveled to Zurich to work along with the bank on possible solutions.

The course of action pursued was bifurcated. Firestone would forego potential profits on forward exchange contracts with Bank Firestone. This allowed the bank to maintain the minimum liquidity required under Swiss law, without requiring Firestone to make an additional capital contribution to a corporate entity that was about to be liquidated. Similarly, Alps also cancelled profitable forward exchange contracts with the bank. Thus the loss to Bank Firestone was minimized.

Early in 1975 the Firestone board of directors passed a resolution to liquidate the bank. Due to Premchand's impending retirement, Denny was appointed acting chairman during the liquidation process. Reese and Denny traveled to Zurich to announce the decision to the bank employees and the Swiss Banking Commission. The overall liquidation and dissolution of the bank and its subsidiaries was accomplished by the liquidators of Bank Firestone with the advice and consultation of Hussy.

There were several reasons behind the decision to liquidate Bank Firestone. First, Firestone was concerned that their internal auditors had difficulty penetrating the bank to reveal its operating procedures. The question arose whether a bank in Zurich under these circumstances would serve any worthwhile purpose for a tire company headquartered in Ohio.

Second, the bank came precariously close to losing ten million dollars on the failure of the Herstadt Bank. There was also the exposure resulting from the Finabank loss. Third, Firestone had a substantial investment of thirty million francs in Bank Firestone. Due to the fact the Swiss franc appreciated against the dollar, Firestone's investment on its equity almost doubled. There was an incentive to take the gains and leave.

The fourth and perhaps the most compelling reason for liquidating the bank was that it had been the creation of Mr. Premchand and under his sole control. When he decided to retire, Firestone was simply unable to find anyone competent to manage the bank. Nor was Firestone able to find a buyer for the bank.

Denny's role in the liquidation of the bank was to supervise the winding down process which involved (1) notifying all customers of the bank that it would cease operations and the appropriate arrangements should be made to withdraw their funds, (2) publishing a public notification of the bank's intention to liquidate so that there would be a reasonable opportunity to raise any claims against the bank, (3) settling on employee contracts and benefits, and (4) resolving the leases and disposing of the other physical assets of the bank.

In essence, it was Denny's responsibility to supervise an orderly process for collecting and offsetting the liabilities and assets of the bank. Hussy's expertise was heavily relied upon in winding up the affairs of Bank Firestone. After everything was netted, the bank had a surplus which was deposited in a Swiss bank. A dividend was declared in the amount of the surplus and paid to the sole shareholder, Firestone.

## II.

In 1934, upon the recommendation of the President, Congress passed the Gold Act. The legislation was enacted to enable the executive branch "to restore a fairer price level, to arrive eventually at a less variable dollar and to improve our financial and monetary system." H.R.Rep. No. 292, 73d Cong., 2d Sess. 2 (1934). Section 3 of the Gold Act[5] authorizes the Secretary of Treasury to promulgate regulations for the management of the United States gold stock and for other purposes not inconsistent with the overall goals of the Act. Under section 4,[6] failure to comply with the Gold Act or its implementing regulations subjects the violator to forfeiture and a penalty equal to twice the value of the subject gold. *See also* 31 C.F.R. § 54.11(a).

The Government prosecutes the instant civil action for violations of 31 C.F.R. § 54.14(a), which prohibits the acquisition and holding of gold outside the United States by persons subject to the jurisdiction of the United States, except to the extent permitted by licenses.[7] As a corporation licensed and doing business in the State of Ohio, Firestone is subject to the jurisdiction of the United States. *See* 31 C.F.R. § 54.-4(a)(13)(iii). Under the Government's theory of liability, the price differential captured and the residual gold claims retained by Alps violated § 54.14(a) of the gold regulations. It is further alleged, as a basis for imposing liability upon Firestone for the infractions, that Bank Firestone and Alps were instrumentalities of Firestone and were operated by the parent to circumvent the U.S. gold regulations. The Government requests the imposition of the statutory money penalty set forth in section 4 of the Gold Act.

---

**5.** Formerly codified at 31 U.S.C. § 442.

**6.** Formerly codified at 31 U.S.C. § 443.

**7.** It is undisputed that neither Firestone nor Bank Firestone obtained such a license.

### III.

Firestone attacks the legal sufficiency of the Government's cause of action on three grounds. Relying upon the statutory authorization under the Gold Act and principles of international law, defendant assails the Court's subject matter jurisdiction over the conduct of foreign nationals occurring outside the United States. Portraying the monetary sanction the Government seeks to impose as penal in nature, Firestone asserts that it is constitutionally impermissible to enforce the penalty through a civil action. Finally, Firestone persuasively argues that a substantial portion of the transactions at issue are not actionable because they fall outside the applicable statute of limitations.

### A.

The Government maintains the within action against Firestone, as a United States national,[8] for transactions in gold claims executed in Switzerland. These transactions were facilitated by Bank Firestone and its wholly owned subsidiary, Alps, on the behalf of the bank's customers. Both Bank Firestone and Alps were nationals of Switzerland. The Government's theory of liability is that these Swiss business entities were operated by Firestone as instrumentalities through which defendant relied upon an agency relationship in attempting to circumvent the U.S. gold regulations. Therefore, the Government seeks to impose civil penalties upon a United States national for its extraterritorial conduct, as an agent is merely a means of executing the purpose of its principal. *See United States v. Aluminum Co. of America*, 148 F.2d 416, 444 (2d Cir. 1945).

**8.** A business entity takes on the nationality of the state that creates it. Restatement (Second) of the Foreign Relations Law of the United States § 27 (1965).

**9.** Firestone contends that the licensing requirements under the U.S. gold regulations were at odds with Swiss bank secrecy law. The quandary of inconsistent conduct, argues Firestone, militates in favor of a federal court declining to exercise jurisdiction over a Swiss national who can comply with U.S. law only at the expense of violating Swiss law.

If any other reasonable construction is possible, principles of international comity may very

▮ "Congress in prescribing standards of conduct for American citizens may project the impact of its laws beyond the territorial boundaries of the United States." *Steele v. Bulova Watch Co.*, 344 U.S. 280, 282, 73 S.Ct. 252, 253, 97 L.Ed. 252 (1952). *See* Restatement (Second) of the Foreign Relations Law of the United States § 30 (1965). Whether an act of Congress extends the jurisdiction of the federal courts beyond the territorial boundaries of the United States is a matter of statutory construction. *Steele v. Bulova Watch Co., supra* at 282–83, 73 S.Ct. at 253–54; *Foley Bros. v. Filardo*, 336 U.S. 281, 284, 69 S.Ct. 575, 577, 93 L.Ed. 680 (1949); *Chumney v. Nixon*, 615 F.2d 389, 391 (6th Cir. 1980).

▮ The power of Congress to prescribe rules governing the extraterritorial conduct of its nationals is circumscribed only by the safeguards of the United States Constitution. *See Leasco Data Processing Equipment Corp. v. Maxwell*, 468 F.2d 1326, 1334 (2d Cir. 1972); *United States v. Aluminum Co. of America*, 148 F.2d 416 (2d Cir. 1945). *Cf. Steele v. Bulova Watch Co., supra*, 344 U.S. at 282–83, 73 S.Ct. at 253–54 (extraterritorial jurisdiction depends upon statutory construction not limitations upon congressional power). Principles of international law do not constrain this legislative power. *United States v. Mitchell*, 553 F.2d 996, 1001 (5th Cir. 1977). Where Congress provides for the extraterritorial application of a rule of law, it is inconsistent with the judicial function to speculate on potential international complications or the wisdom of the legislation.[9]

well suggest that an act of Congress should not be interpreted to require the violation of the law of another nation. *See Murray v. Charming Betsy*, 6 U.S. (2 Cranch) 64, 118 (1804). But once a manifest intent by Congress to extraterritorially extend legislative regulation is present, principles of international comity cannot support a judicial negation of the jurisdictional mandate.

Additionally, the posture of the instant case is inimical to Firestone's argument. Where the Government commences an action against a U.S. national for allegedly deploying foreign corporate formalities to circumvent the extra-

In unequivocal language, 31 C.F.R. § 54.14(a) proscribes the extraterritorial acquisition or holding of gold. The validity of the regulation turns on the scope of the statutory authorization. *See United States v. Larionoff*, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–14, 96 S.Ct. 1375, 1390–91, 47 L.Ed.2d 668 (1976). An executive agency cannot, in administering the policy decisions of the legislature, expand the jurisdictional scope of the authorizing statute. *See FMC v. Seatrain Lines, Inc.*, 411 U.S. 726, 745–46, 93 S.Ct. 1773, 1784–85, 36 L.Ed.2d 620 (1973).

Section 3 of the Gold Act [10] authorizes the Secretary of Treasury to promulgate regulations for the conditions under which gold may be acquired and held. It also provides that "[s]uch regulations may exempt from the provisions of this section, in whole or in part, gold situated in the Philippine Islands or other places beyond the limits of the continental United States."

Drawing upon the principle of *ejusdem generis*, Firestone posits that a construction of the general phrase "other places" must be limited to a class of territories maintaining a political relationship with the United States similar to that of the Philippines. The construction urged by Firestone, however, misapplies the principle of *ejusdem generis* and ignores the historical explanation for the specific reference to the Philippines.[11]

*Ejusdem generis* counsels "that if a series of more than two items ends with a catch-all term that is broader than the category into which the preceding items fall but which those items do not exhaust, the catch-all term is presumably intended to be no broader than the category." R. Dickerson, The Interpretation And Application of Statutes 234 (1975). *See Gooch v. United States*, 297 U.S. 124, 128, 56 S.Ct. 395, 397, 80 L.Ed. 522 (1936). The principle cannot appropriately be applied where the catch-all term follows only a single item. The contours of a general, catch-all term cannot be shaped by a single item that it may follow, because it is conceptually impossible for one item to provide a meaningful basis upon which to define a category.

Section 3 of the Gold Act singularly refers to the Philippines, not to more than two defined geographical areas. The isolated reference to the Philippines is insufficient to establish a category within which all "other places" must fall. For this reason, the cannon of *ejusdem generis* can provide no guidance in arriving at a lexicographical assertion concerning the usage of the phrase "other places."

There is a historical explanation for the reference to the Philippines in section 3 of the Gold Act. Under the provisions of treaties between the United States and Spain in

---

territorial breadth of U.S. law, it is by the defendant's own design that inconsistent conduct is required. The defendant's peril is artificial and cannot be raised as a defense to a civil prosecution.

10. As enacted into positive law, section 3 provides in full that

The Secretary of the Treasury shall, by regulations issued hereunder, with the approval of the President, prescribe the conditions under which gold may be acquired and held, transported, melted or treated, imported, exported, or earmarked: (a) for industrial, professional and artistic use; (b) by the Federal Reserve banks for the purpose of settling international balances; and, (c) for such other purposes as in his judgment are not inconsistent with the purposes of this act. Gold in any form may be acquired, transported, melted or treated, imported, exported, or ear

marked or held in custody for foreign or domestic account (except on behalf of the United States) only to the extent permitted by, and subject to the conditions proscribed in, or pursuant to, such regulations. Such regulations may exempt from the provisions of this section, in whole or in part, gold situated in the Philippine Islands or other places beyond the limits of the continental United States.

48 Stat. 340.

11. For similar reasons, the principle of *noscitur a sociis*, instructing that as a tool of statutory interpretation neighboring words should be read in context, *see Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961), provides no support for the construction offered by Firestone.

1898 and 1900, the Philippine Islands became a territorial possession of the United States. In an enactment entitled "An Act to declare the purpose of the people of the United States as to the future political status of the Philippine Islands, and to provide a more autonomous government for those islands," 39 Stat. 545 (1916), Congress stated its intention to recognize the independence of the Philippines as soon as a stable government could be formed.

Section 5 of the enactment provides "That the statutory laws of the United States hereinafter enacted shall not apply to the Philippine Islands, except when they specifically so provide, or it is so provided in this Act." 39 Stat. 547. In order to insure that the extraterritorial scope of the Gold Act included the Philippine Islands, it was necessary for Congress to draft into the legislation specific reference to the territorial possession.[12] It is unmistakably clear that the reference to the Philippines in section 3 of the Gold Act was not intended to tailor a category defining the contours of the phrase "other places."

In applying a statute, it is the quintessential role of the court to carry out the intent of the legislature. The utility and proper application of any cannon of statutory construction is therefore measured by its ability to identify legislative intent.

In light of the relevant history of the relationship between the United States and the Philippines, the plain meaning rule is suited better than any other cannon of statutory construction to explain in a cognitive sense the phrase "other places beyond the limits of the continental United States." Congress placed within the office of the Secretary of Treasury the power to exempt from regulation gold held extraterritorially. The authorization in section 3 is not limited to the Philippines and other similarly situated territorial possessions, but broadly encompasses other places beyond the continental limits of the United States including the Philippines.

The exemption authorization contained in section 3 of the Gold Act presupposes the underlying extraterritorial reach of the enactment. Vesting with the Secretary the discretion to decide whether and when extraterritorial regulation might be advisable is an example of the recognition that "[n]ecessity ... fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules." *American Power & Light Co. v. SEC*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946).

An analysis of the legislative history of the Gold Act also supports this construction of section 3. The immediate goal of the Gold Act was to place in the possession of the treasury all monetary gold stock in the United States. H.R.Rep.No. 292, 73rd Cong., 2d Sess. 2 (1934). This was the first step in a series of actions taken by Congress, through the Gold Act, to achieve the overriding goal of strengthening the U.S. currency system. Toward this end a large fund was established under section 10 of the Gold Act to allow the Secretary of Treasury to deal in gold and foreign exchange so that the exchange value of the dollar could be stabilized. *Id.* at 2–3. The ability to regulate extraterritorial gold gave the Secretary of Treasury the power to function more efficiently in the gold market by controlling competition from U.S. citizens.

In section 14 of the Provisional Regulations, the initial regulations passed contemporaneously with the Gold Act, the Secretary of Treasury exercised his authority to exempt extraterritorial gold. In 1962 extraterritorial gold was placed under the regulation of the Secretary. 27 Fed.Reg. (1962) (codified at 31 C.F.R. § 54.14). Although other sections of the Gold Act were subsequently amended in 1968, Congress expressed no indication that the Secretary had exceeded his statutory authority under sec-

---

12. On what was apparently understood as the authority of Presidential Proclamation No. 2,695, 11 Fed.Reg. 7,517 (1946), granting independence to the Philippines, the words "the Philippine Islands or other" were omitted from the codification of the Gold Act in Title 31 of the United States Code. 31 U.S.C. § 442 (1970) (codifier's note).

tion 3 of the Gold Act by regulating extraterritorial gold. *See* Pub.L.No. 90–269, 82 Stat. 50 (1968).

Furthermore, in recommending the 1974 repeal of the restrictions on gold the House Committee on Banking and Currency implicitly acknowledge the legislative authority for the regulations codified in 31 C.F.R., Part 54. The Committee was concerned only with the timing of removing the restrictions, not their validity, and therefore endorsed repealing the regulations upon the President's report to Congress that the repeal would have no adverse effect upon the international money position of the United States. H.R.Rep.No. 93–203, 93rd Cong., 1st Sess., *reprinted in* [1973] U.S.Code Cong. & Ad.News 2050, 2061–62.

### B.

█ Firestone challenges the constitutionality of the Government's civil efforts to enforce the money penalty provisions of section 4 of the Gold Act.[13] Seven traditional tests for determining whether a particular sanction is punitive were identified in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963).[14] These factors, however, are "neither exhaustive nor conclusive on the issue." *United States v. Ward*, 448 U.S. 242, 250, 100 S.Ct. 2636, 2642, 65 L.Ed.2d 742 (1980).

█ In the final analysis, "whether a particular statutorily-defined penalty is civil or criminal is a matter of statutory construction." *Id.* at 248, 100 S.Ct. at 2641. The analysis proceeds on two levels: (1) a determination whether Congress expressly or implicitly indicated a preference for labeling the penalty provision as either civil or criminal; and (2) if an intention to establish a civil penalty is indicated, the inquiry focuses upon whether the penalty is so punitive that it operates to negate that intent. *Id.* at 248–49, 100 S.Ct. at 2640–41.

Section 4 of the Act provides that gold held in violation of the Act shall be subject to condemnation and forfeiture proceedings, which traditionally have been civil remedies. Juxtapositioned immediately following the condemnation and forfeiture penalties is the provision that "any person failing to comply with the provisions of this Act or of any such regulations or licenses, shall be subject to a penalty equal to twice the value of the gold in respect of which such failure occurred." There is no statutory language that attempts to distinguish the latter from the former, traditionally civil penalties. Thus, it is implicit that Congress intended to establish a civil, remedial mechanism.

█ The Trading with the Enemy Act of 1917, 40 Stat. 411, criminally sanctions

---

**13.** As enacted into positive law, section 4 provides in full that

Any gold withheld, acquired, transported, melted, or treated, imported, exported, or earmarked or held in custody in violation of this Act or of any regulations issued hereunder, or licenses issued pursuant thereto, shall be forfeited to the United States, and may be seized and condemned by like proceedings as those provided by law for the forfeiture, seizure, and condemnation of property imported into the United States contrary to law; and in addition any person failing to comply with the provisions of this Act or of any such regulations or licenses, shall be subject to a penalty equal to twice the value of the gold in respect of which such failure occurred.

48 Stat. 340.

With one possible exception, *cf. United States v. 98 $20 United States Gold Coins*, 20 F.Supp. 354 (E.D.Pa.1937) (penal nature of forfeiture provision requires showing of intent), the federal courts have uniformly held that the penalties called for under section 4 are civil.

*See United States v. Chabot*, 193 F.2d 287, 290 (2d Cir. 1951); *United States v. Two Hundred Fifty-four U.S. Gold Coins*, 355 F.Supp. 298, 300–02 (E.D.Mich.1973); *United States v. One Solid Gold Object*, 191 F.Supp. 198, 200 (D.Nev. 1961).

**14.** In *Mendoza-Martinez* the seven standard tests were described as follows: "Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter*, whether its operation will promote the traditional aims of punishment-retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable to it, and whether it appears excessive in relation to the alternative purpose assigned . . . ." 372 U.S. 168–69, 83 S.Ct. 567–68 (footnotes deleted).

conduct with respect to gold similar to that proscribed by the Gold Act. 12 U.S.C. § 95a(3). *See* 31 C.F.R. § 54.11. To impose both a criminal and civil sanction for the same act or omission is a policy decision that falls completely within the legislative prerogative of Congress. *Helvering v. Mitchell,* 303 U.S. 391, 399, 58 S.Ct. 630, 633, 82 L.Ed. 917 (1938). That there were preexisting criminal sanctions for essentially the same conduct proscribed under the Gold Act additionally supports the construction of section 4 as a civil remedy. *United States v. Chabot,* 193 F.2d 287, 290 (2d Cir. 1951). *See One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 236–37, 93 S.Ct. 489, 492–93, 34 L.Ed.2d 438 (1972).

Turning to the issue whether the penalty provision is so punitive that it negates the intention to establish a civil penalty, "only the clearest proof could suffice to establish the unconstitutionality of a statute on such a ground." *Flemming v. Nestor,* 363 U.S. 603, 617, 80 S.Ct. 1367, 1376, 4 L.Ed.2d 1435 (1960). *See United States v. Ward, supra,* 448 U.S. at 249, 100 S.Ct. at 2641. Based largely upon the specific amount of the fine the Government seeks to impose, Firestone vociferously contends that the penalty provisions of section 4 are punitive in purpose and effect. Section 4, however, simply provides that the violator "shall be subject to a penalty equal to twice the value of the gold." The objective application of this formula is not exorbitant. Whatever total fine the standard may impose in this particular case does not aid Firestone.

It defies both logic and sound judgment to allow a defendant to raise a hefty fine, generated solely by the application of an objective standard to cumulative conduct, as a defense to the imposition of that penalty in a civil proceeding. It would produce an inequitable discrimination between the sporadic and the persistent violator, subjecting the former to civil process while affording the latter all the constitutional protections attendant to criminal prosecutions. The amount of a penalty sought by the Government, when calculated by the application of an objective and statutorily prescribed standard to a defendant's cumulative conduct, is in itself insufficient to overcome an implicit congressional classification of the penalty provision as civil.

## C.

28 U.S.C. § 2462 establishes a five year statute of limitations for any suit brought to enforce a civil fine. Firestone notes that a majority of the transactions in gold claims at issue fall outside the statute of limitations. The Government retorts that the equitable doctrine of fraudulent concealment tolls the statute of limitations.

■ Equity reads the doctrine of fraudulent concealment into every statute of limitations. *Holmberg v. Armbrecht,* 327 U.S. 392, 396–97, 66 S.Ct. 582, 584–85, 90 L.Ed. 743 (1946); *Akron Presform Mold Co. v. McNeil Corp.,* 496 F.2d 230 (6th Cir.), *cert. denied,* 419 U.S. 997, 95 S.Ct. 310, 42 L.Ed.2d 270 (1974). It is incumbent upon the plaintiff to establish three elements: "(1) wrongful concealment of their actions by the defendant; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire & Rubber Co.,* 523 F.2d 389, 394 (6th Cir. 1975).

■ Furthermore, Rule 9(b), Federal Rules of Civil Procedure, requires that "the party alleging fraudulent concealment must plead the circumstances giving rise to it with particularity." *Dayco Corp. v. Goodyear Tire & Rubber Co., supra* at 394. The only reference in the complaint to fraudulent concealment is the Government's broad allegation that "secret agreements, sham transactions, and the alteration or amendment of written documents" concealed the activity in gold claims. In addition to the lack of specificity with which defendant's fraudulent concealment was pled, the complaint is totally deficient with respect to the remaining two elements.

The failure to comply with the pleading requirements for fraud notwithstanding, the Government has not otherwise built a

record sufficient to satisfy the requisite elements justifying an application of the fraudulent concealment doctrine. There has been no showing that defendant concealed the precious metal transactions by Bank Firestone or Alps, that any concealment caused the Government to fail to discover the facts underlying its complaint, or that the Government acted with all due diligence until those facts were discovered.

Equity does not, under the circumstances in the present case, toll the applicable five year statute of limitations. The complaint was filed in this case on March 15, 1979. Therefore, the Government's action can proceed only against transactions in gold claims occurring after March 15, 1974, but prior to the repeal of the restrictions on gold.

### IV.

The central theory of liability espoused by the Government in this case is that Bank Firestone and Alps were instrumentalities of Firestone, operated as an alter ego to generate profits for the Akron based company through engaging in illegal transactions in gold. Based upon the legal posture of the case, as shaped by the complaint and pursued at trial, Firestone can be held liable for the conduct of Bank Firestone and Alps only if the Government prevails on two issues.

As a threshold element of the Government's claim, it must be established that the transactions in gold claims reposed in Bank Firestone or Alps a legal or equitable interest in gold proscribed under 31 C.F.R. § 54.14(a). Also, the Government must demonstrate that Bank Firestone and Alps were instrumentalities of Firestone, managed as alter egos to escape the prohibitions of the U.S. gold regulations. The character of the gold claims at issue is dispositive of the liability issue. The Court addresses the separate corporateness of Firestone and Bank Firestone as an alternate ground in support of its decision.

### A.

 31 C.F.R. § 54.14(a) provides in relevant part that "[g]old in any form situated outside of the United States may be acquired, held, transported, melted or treated, or earmarked by or on behalf of persons subject to the jurisdiction of the United States only to the extent permitted by licenses." The regulations distinguish between a number of the different physical forms in which gold may exist: coin, bullion, fabricated, scrap, and natural deposits. 31 C.F.R. § 54.4(a) (7), (8), (9), (10) & (11). "Hold" is broadly defined to include "actual or constructive possession of or the retention of any interest, legal or equitable, in such gold." 31 C.F.R. § 54.4(a)(12).

The gold regulations are concerned with all forms of constructive or actual and legal or equitable ownership interests in physical gold wherever located. *See* 31 C.F.R. §§ 54.4(a)(12) & 54.14(a). Speculation in gold as a commodity with a fluctuating price is regulated only as that activity relates to the exchanges in the United States. *See* 31 C.F.R. § 54.15. To construe § 54.-14(a) as prohibiting speculation in gold futures would be incompatible with the language contained in that provision. Such a construction would also render § 54.15 superfluous, if not inconsistent with § 54.-14(a).

The various forms of gold covered in the definitional section of the regulations and the common usage for each type of activity proscribed in 31 C.F.R. § 54.14(a) presumes that the subject gold has the physical properties of a tangible substance. Also, the type of conduct prohibited is that which is commonly associated with property or ownership interests.

That § 54.14(a) addresses itself to physical gold is further supported by the section it immediately precedes. 31 C.F.R. § 54.15 prohibits the execution of gold futures contracts on any exchange in the United States. Read together with its companion regulations, § 54.15 singles out gold futures contracts as an interest in gold that is distinguishable from the type of activity regulated under § 54.14(a). Futures are contractual commitments to buy or sell commodities, but do not transfer any ownership rights to identifiable goods.

If § 54.14(a) were construed to regulate both the acquisition of ownership rights in physical gold and the speculation in gold futures contracts, its coverages would emasculate § 54.15 of any meaning. Such an interpretation would collapse the distinction made in the gold regulations between ownership rights and contractual rights. Equally problematical under this interpretation is that the prohibition on the speculation in gold futures contracts, limited by § 54.15 to contracts made on any exchange in the United States, cannot be given effect consistently with § 54.14(a) pervasive regulation of gold located outside the United States.

31 C.F.R. § 54.14(a) is directed toward ownership rights in physical gold. What interests in gold are prohibited under 31 C.F.R. § 54.14(a) is a matter of federal law. To determine what interests attach to an obligatory gold claim on metal account, the analysis must focus on the law of Switzerland as the country in which the transactions were executed and acquired their legal import. *See American Banana v. United Fruit Co.*, 213 U.S. 347, 356, 29 S.Ct. 511, 512, 53 L.Ed. 826 (1909).

 There are two elements to the transfer of ownership rights to physical property under Swiss law. First, there must be transfer of physical custody or possession from the seller to the buyer whether actual or constructive. Second, there must be consensus between the seller and the buyer on their intention to transfer title from the seller to the buyer. It is not necessary that the seller have physical possession of the goods that are the subject of a sales contract.

An obligatory gold claim is a contractual duty on the part of the seller to procure and deliver either on maturity date of the claim, or if there is no maturity date of the claim, upon demand of the buyer, the object which is promised for delivery. It does not differ significantly from a gold futures contract. A gold claim is for a specific quantity of gold, without clear individualization of each single object it concerns, and thus by its very nature reposes in the buyer no direct ownership rights. There may be ownership in a gold claim, but there is no ownership rights in the object concerned by that claim.

In practice the typical customer will purchase a gold claim for an exact weight in gold. For this purchase the customer will receive a credit on metal account for the exact weight of the purchase. The credit on metal account gives no ownership rights in specific gold but only a gold claim which obliges the issuer to pass over the specific amount of gold stated in the claim. This obligation by the bank issuing the gold claim is merely contractual and does not give the purchaser any ownership rights in any identifiable bar or mass of gold bullion or gold coin.[15] The purchaser accepts the gold claim in reliance only upon the credit worthiness of the issuing institution. That institution need not have any physical gold in its possession, because the customer purchases the gold claim as a form of speculation in the market price of gold.

Alternatively, a purchaser may request the allocation and physical transfer of specific identifiable gold,[16] which then can be kept and deposited with the bank in the customer's safe deposit box. If a purchaser requests such an allocation he effectuates a conversion from fungible unidentified property, in which he has no ownership, to earmarked segregated property in which he holds an ownership interest.

All purchases facilitated by Bank Firestone were made in the former sense. That is, purchases by the bank resulted in a credit to the customer's metal account. Consequently, none of the gold transactions by Bank Firestone created any ownership interests or ownership rights in gold. The

---

15. The rights of a customer of a gold claim are determined by the contract between the bank and the customer. The contractual rights arising under the gold claims are thus unique to the Swiss bank executing the transaction.

16. Some forms of gold bullion are individually earmarked. Gold bars as a general rule will bear a serial number, the identification of fitness, seal of the melter and assayer, and a certificate indicating the exact weight.

purchase and sale of a gold claim does not result in the actual or constructive transfer of physical custody or possession of any gold. No more or less interest in gold would have been acquired by Bank Firestone or its customers through the purchase of a gold claim than would have been acquired through the purchase of a gold futures contract. Both are merely obligatory contractual claims against the issuer which do not pass ownership interests or ownership rights in gold.

Whether Bank Firestone acted as a broker in executing orders on behalf of customers to purchase gold claims, functioned as a dealer by generating profits from the transactions beyond the standard commission, or held title to gold claims for its own speculative purposes is not a material issue. The gold claims that are the subject of the instant suit did not repose in the holder any interest in gold proscribed under 31 C.F.R. § 54.14(a).

### B.

■ Assuming arguendo that the transactions in gold claims by Bank Firestone and Alps were executed in violation of 31 C.F.R. § 54.14(a), to prevail in this suit the Government must additionally establish some theory of penetrating the corporate veil and ascribing liability to Firestone. Under the gold regulations, the constructive possession of gold is prohibited. 31 C.F.R. §§ 54.4(a)(12) & 54.14(a). Constructive possession is the power to exercise control and dominion over the subject matter. *See United States v. Holland*, 445 F.2d 701 (D.C. Cir.1971); *United States v. DiNovo*, 523 F.2d 197 (7th Cir.), *cert. denied*, 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 387 (1975).

■ It is the Government's contention that through its status as sole shareholder, Firestone exercised control over Bank Firestone's transactions in gold claims and, therefore, those claims were constructively held for the benefit of Firestone. The ben-

efit from these transactions enured to Firestone when Bank Firestone was liquidated and the net gain was paid as a dividend to its sole shareholder. Part of the net gain was represented by the profits Alps generated by capturing the price differential on the gold claim transactions it facilitated.

Disregarding the corporate form to impose civil liability upon a shareholder entails a consideration of factors that will vary with the nature of the cause of action. The reasons for piercing the corporate veil in a contract action are dissimilar in many respects from the reasons that would support holding a shareholder liable in a tort action. *Compare* 38 A.L.R.3d 1102 (1971) *with* 7 A.L.R.3d 1343 (1966). The relevant considerations are equally unique in a civil prosecution by the Government for statutory and regulatory violations.

Swiss and U.S. law are without material difference on the relationship between a shareholder and corporation, even where the shareholder controls all the outstanding stock. Because of the injurious effect it would have on the role of equity financing in the business sector, a rule of liability that holds a shareholder accountable for violations of statutory law by the corporation solely on the basis of the shareholder's equity in the corporation is not supportable under the common law.[17]

■ As a general proposition the corporate entity will not be disregarded. But "a strict adherence to common law principles is not required in the determination of whether a parent should be held for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." *P. F. Collier & Son Corp. v. FTC*, 427 F.2d 261, 267 (6th Cir. 1970). Thus corporate formalities cannot be used to circumvent a statutory policy. The violation of law perpetrated through a corporate entity is one of the clearest areas where the courts will intercede to hold the shareholder

---

17. The legislature may enact or authorize such a rule of liability. 31 C.F.R. § 54.14(b) prohibits the holding of securities issued by a person maintaining gold as a substantial part of his assets. The impact of this section is not material to the instant case, as the government does not charge Firestone with any violation of 31 C.F.R. § 54.14(b).

or parent corporation liable. *See* N. Lattin, Lattin on Corporations 82 (1971). So long as the violated provision of law is extraterritorial, the fact that a foreign subsidiary was utilized as an instrumentality to engage in the violative conduct will not shield the parent from liability. *See* Restatement (Second) of the Foreign Relations Law of the United States § 27 (1965) (comment d).

The competent proofs offered at trial fail to establish that Firestone operated its wholly owned subsidiary, Bank Firestone, as an instrumentality to circumvent the U.S. gold regulations. Bank Firestone was operated at arm's length from its parent as required by Swiss law and as a condition to Premchand's acceptance of the chairmanship. No intrusion into the independence of the bank's management was detected by the bank law auditors.

Furthermore, far from being in a position to control its subsidiary, one of the factors contributing to the decision to leave the Swiss banking business was that Bank Firestone maintained a degree of independence unacceptably greater than any other Firestone subsidiary. It was not even possible for the parent to satisfy itself that its investment was well managed, as Firestone's internal auditors were unable to fully conduct the routine audit made on all its other subsidiaries. On the other side of the relationship, Premchand became increasingly impatient with Firestone's inquiries into and concern for the operating procedures of the bank, particularly as they related to the transactions in gold claims.

Nor do the cooperative efforts between parent and subsidiary to avert a severe financial crises in both the Herstadt and Finabank matters demonstrate any control by Firestone over Bank Firestone. Firestone's management had experience that would benefit the bank in resolving these financial problems and thus protect Firestone's investment in the bank. There is no indication that these cooperative efforts were manifestations of the parent's control over its subsidiary. Moreover, and perhaps more importantly, the Herstadt and Finabank matters were subsequent to Premchand's decision to utilize Alps to facilitate customer transactions in gold claims and

are of little probative value relative to the issue whether Firestone relied on corporate formality to violate U.S. law.

There is no evidence to factually support the Government's claim that Bank Firestone was utilized as an instrumentality of Firestone to circumvent the U.S. gold regulations. This is not a case where the subsidiary functioned as an agent of the parent to indirectly accomplish what otherwise would be prohibited and illegal. Therefore, the separate corporateness of Firestone and Bank Firestone shall not be disregarded.

### V.

The extraterritorial application of the gold regulations by the Secretary of Treasury was consistent with the authorization in section 3 of the Gold Act. The gold claims purchased and sold by Bank Firestone and Alps reposed in neither of those two corporate entities any interest in gold that is prohibited by 31 C.F.R. § 54.14(a). Even if the transactions in gold claims violated the pertinent provision of the gold regulations, there is no basis in law or fact that would support holding Firestone liable for such infractions.

Accordingly, the Court hereby finds in favor of the defendant, Firestone, on the Government's cause of action for violations of 31 C.F.R. § 54.14(a).

IT IS SO ORDERED.