34 F.Supp.2d 1147 (1999)
UNITED STATES of America, Plaintiff,
v.
SHELTON WHOLESALE, INC., a Missouri corporation, d/b/a Shelton Fireworks; Polaris Fireworks, Inc., a Missouri corporation; and Greg Shelton, an individual, Defendants.
Greg Shelton, Shelton Wholesale, Inc. and the National Fireworks Association, Ltd., Plaintiffs,
v.
United States Consumer Product Safety Commission, Ann Brown and Eric B. Ault, Defendants.
Nos. 96-6131-CV-SJ-6, 97-6021-CV-SJ-4-6.
United States District Court, W.D. Missouri, St. Joseph Division.
January 6, 1999.
*1148 *1149 Drake Cutini and Anthony Scott Barkow, U.S. Department of Justice, Office of Consumer Litigation, Washington, D.C., for plaintiff in No. 96-6131-CV-SJ-6.
David W. Whipple, Whipple Law Firm, Kansas City, MO, for defendants in No. 96-6131-CV-SJ-6.
David W. Whipple, Whipple Law Firm, Kansas City, MO, Robert B. Hopkins, Ober, Kaler, Grimes & Shriver, Baltimore, MD, for plaintiffs in No. 97-6021-CV-SJ-6.
Drake Cutini and Anthony Scott Barkow, U.S. Department of Justice, Office of Consumer Litigation, Washington, D.C., Melissa V. Hampshire, U.S. Consumer Product Safety Commission, Bethesda, MD, for defendants in No. 97-6021-CV-SJ-6.

MEMORANDUM AND ORDER
SACHS, District Judge.
This matter is before the court following trial, post-trial briefing and oral argument concerning several items left unresolved by this court's April 1998 summary judgment order (the "April Order"). Having heard the evidence, considered the parties' submissions and held oral argument the court will enter judgment in favor of the Government in both the Fine Case (Case No. 96-6131-CV-SJ-6) and the NFA Case (Case 97-6021-CV-SJ-6) for the reasons set forth below.[1]

I. Procedural Recap.
Before turning to the parties' trial and post-trial arguments, a brief recap of the 26-page April Order is appropriate. In that order, the court concluded, among other things, that: (1) the Consumer Product Safety Commission ("CPSC") possesses jurisdiction over common fireworks (April Order at 8-10); (2) the nineteen products at issue were introduced into interstate commerce the moment they left Hong Kong (id. at 10-11); (3) laches did not bar the CPSC from proceeding as to products 1-7 (id. at 11); (4) the CPSC's discretionary decision to permit Shelton[2] to sell five products that failed a CPSC test did not preclude enforcement action against Shelton based on those products *1150 (id. at 12-13); (5) making decisions about an entire shipment based on sampling is permissible under the FHSA (id. at 14-15); (6) no issue of fact existed in the Fine Case (Case No. 96-6131-CV-SJ-6) concerning Shelton's allegation that the CPSC takes non-random samples based on visual clues (leakage and crooked sticks) because none of the products at issue failed the straightness test and there was no evidence that the CPSC purposely selected products 5 and 6 because they were leaking (id. at 16); (7) issues of fact remained in the NFA Case (Case No. 97-6021-CV-SJ-6) concerning Shelton's allegation that the CPSC takes non-random samples based on visual clues (id. at 16-17);[3] (8) genuine issues of fact existed in both cases over whether valid statistical inferences could be drawn where sub-samples for stick straightness and rigidity tests were not selected randomly (id. at 17-18); (9) summary judgment was proper in favor of the Government on Shelton's due process claim (id. at 18-20); (10) questions of whether the CPSC's sampling techniques were faulty for failing to adjust for the numbers of devices within a particular shipment of product and whether the CPSC's fuse burn test was faulty must be reserved for trial (id. at 20-22);[4] (11) Shelton's challenge to the label requirement failed (id. at 21-22); (12) fact questions precluded decision on whether any violations were "knowing" (id. at 24); (13) summary judgment was proper on Count IV of the NFA Case, alleging "unjustified actions and threats" by the CPSC (id. at 24-25); and (14) it has jurisdiction over the NFA Case (id. at 25).
Just prior to trial, Shelton asked for reconsideration of the court's April Order respecting the due process claim. The court decided to take the motion with the case and to permit evidence concerning the due process claim at trial. The court also determined that the upcoming bench trial was inappropriate for Mr. Greg Shelton, as he had requested a jury trial in his answer to the Government's amended complaint adding him as a party defendant. See May 1, 1998, Order. After the week-long trial in mid-May as to the remaining two defendants, Shelton Wholesale and Polaris, and as directed by the court, the parties submitted deposition testimony, along with designations, objections, and counter-designations. Post-trial briefing followed in August, with responses filed in early October. The matter is before the court following November 5, 1998, oral arguments.

II. Shelton's Due Process Claim.
The court will first dispose of Shelton's renewed due process claim, which is asserted as a defense in the Fine Case and as an affirmative claim in the NFA case. Shelton argues that its due process rights have been violated by the CPSC and that as a result the CPSC should be barred from taking enforcement action against it for any claimed violations. In briefing before trial on this issue, Shelton principally claimed due process violations stemming from: (1) the CPSC's decision to permit it to sell five of the products and then later pursuing injunctive relief based upon them; and (2) the CPSC's alleged failure to provide an independent finder of fact to review evidence submitted by Shelton following the initial determination by the CPSC. See April Order at 18-19. In reconsideration briefing, Shelton argues that its due process rights were violated because the CPSC failed to afford it an administrative hearing, where oral testimony may be introduced, after the initial determination is made that a product violates the FHSA, contrary to 15 U.S.C. § 2066(b), 15 U.S.C. § 1273(a) and 16 C.F.R. § 1500.268. Shelton also reasserts its non-neutral fact-reviewer argument, largely based on the lack of the allegedly statutorily provided hearing process.
*1151 Section 2066(b), which provides in relevant part that "the owner of [an imported] product shall be afforded an opportunity by the Commission for a hearing in accordance with the [Administrative Procedure Act]," is a provision of the Consumer Product Safety Act ("CPSA"). According to 15 U.S.C. § 2079, however, the CPSA applies to products subject to regulation under the FHSA only if "the Commission by rule finds that it is in the public interest to regulate such risk of injury under this chapter." The CPSC states without contravention that it has made no such ruling, and accordingly § 2066(b) has no bearing on the due process issue here.
Section 1273(a) provides that after the delivery of samples from imported products to the CPSC, the owner of the product "may appear before the [CPSC] and have the right to introduce testimony." The regulation at issue, promulgated under § 1273(a), provides:
Hearing(a) If it appears that the hazardous substance may be subject to refusal of admission, the area office director shall give the owner or consignee a written notice to that effect, stating the reasons therefor. The notice shall specify a place and period of time during which the owner or consignee shall have an opportunity to introduce testimony.... Such testimony shall be confined to matters relevant to the admissibility of the hazardous substance, and may be introduced orally or in writing.
16 C.F.R. § 1500.268.
In briefing and at oral argument, both parties appeared to labor under the mistaken belief that if certain formal hearing requirements and procedures are required by § 1273(a) or 16 C.F.R. § 1500.268 (or, for that matter, § 2066(b)), and the required hearing is not provided or the procedures not followed, a violation of constitutional due process automatically follows. See Shelton's Due Process Support Suggestions at 3-7; CPSC's Opposition Suggestions at 3-14. This is not the law. While it is true that those provisions could create in Shelton (and other importers) a constitutionally protected liberty or property interest,[5] and failure to provide the required hearing or follow prescribed procedures could constitute a violation of the statute,[6] what process is due (i.e., the type of hearing, the procedures, etc.) is not measured under the terms of these provisions. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); Brown v. Frey, 889 F.2d 159 (8th Cir.1989); Norris by Norris v. Board of Education of Greenwood Community School Corp., 797 F.Supp. 1452 (S.D.Ind.1992).
Thus, merely because a statutory provision, regulation or agency protocol may call for an opportunity to introduce oral testimony, as here, appear at an administrative hearing before an Administrative Law Judge, as may be required under § 2066(b), cross-examine witnesses, or engage in oral argument, constitutionally sufficient due process may be supplied with far less. In any event, the court notes that both Sugarman v. Forbragd, 405 F.2d 1189 (9th Cir.1968), aff'g 267 F.Supp. 817 (N.D.Cal.1967), and Meserey v. United States, 447 F.Supp. 548 (D.Nev.1977), interpreted the Food, Drug, and Cosmetic Act, which contains both a statute (21 U.S.C. § 381(a)) and regulation (21 C.F.R. § 1.94(a)) identical in material respects to the statute and regulation at issue here, as not requiring a formal trial-type hearing.
The court thus turns to the ultimate question, whether the procedures actually provided by the CPSC supply the necessary due process. "Due process is flexible and calls for such procedural protections as the particular situation demands." Memphis Light, Gas and Water Division v. Craft, 436 U.S. 1, 14 n. 15, 98 S.Ct. 1554, 56 L.Ed.2d 30 (1978) (quoting Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Indeed, "[t]he opportunity for informal consultations with designated personnel empowered to correct a mistaken determination constitutes a `due process hearing' in appropriate circumstances." Id. at 16, n. 17, *1152 98 S.Ct. 1554. Here, the LOA notices given by the CPSC to Shelton, which state when and where "any information" is to be submitted, clearly put Shelton (and any other importer receiving a similarly worded LOA) on notice of a right to submit evidence to the CPSC.[7]See CPSC Exs. 1D-19D. As was obvious at trial, Shelton has had numerous contacts with CPSC personnel, particularly Mr. Gayman. See, e.g., Tr. 422, 430-41. It may be safely said that other persons engaged in the business of importing fireworks have also had numerous contacts with CPSC personnel. Tr. 135. It is uncontroverted that the CPSC has the authority to correct mistakes. For these reasons, the court concludes that constitutionally sufficient due process is and was provided by the CPSC. The court will, however, briefly review each of the arguments Shelton makes against this conclusion.
Shelton previously argued in this case that a violation of due process exists because the person making the initial enforcement decision (Mr. Gayman in this case) reviews any evidence submitted in response to the LOA and determines whether the submitted evidence is sufficient to warrant reversal. As later briefing by Shelton reveals, however, this is not accurate. See Shelton's Reconsideration Suggestions at 3 (Ex. A thereto at 135-36); CPSC's Opposition Suggestions at 11. When Mr. Gayman receives information in response to a LOA, he forwards that material to CPSC headquarters in Washington where it is reviewed by CPSC compliance officers. Id. Alan Schoem testified at trial that an importer objecting to a CPSC conclusion could appeal that decision to Washington, going over Mr. Gayman's (or the person making the enforcement decision) head. Tr. at 132-33.[8] Accordingly, to the extent that Shelton continues to assert this argument, it is rejected.
Shelton argues that due process is not provided because any review requested does not involve CPSC retesting of fireworks. Shelton concedes, however, that the CPSC testified that it would retest if there was evidence that the testing was done incorrectly. Shelton's Reconsideration Support Suggestions at 3. Contrary to Shelton's assertion, that retesting has only rarely occurred does not necessarily evidence a lack of due process. Any number of explanations may be offered to explain the lack of CPSC retesting (lack of requests, lack of evidence of improper testing, etc.), and Shelton does not offer any evidence to exclude them from the realm of possibility. Accordingly, this point is ruled against Shelton.
Shelton also argues a violation of due process based on an alleged policy preventing an importer from conducting its own testing of fireworks initially found to be violative of the FHSA. See Shelton's Reconsideration Support Suggestions at 3; Shelton's May 26, 1998, Support Suggestions at 10. As Shelton concedes, however, see Shelton's May 26, 1998, Support Suggestions at 10, n. 8, Mr. Gayman testified to the contrary. See Tr. 1099-1102 (stating that he granted the only request to take samples from a shipment held under customs bond). In addition, Shelton's argument fails to acknowledge that United States Custom Services Regulation 19 C.F.R. § 19.8 permits examination and sampling of goods held in a bonded warehouse:
Importers may, upon application approved by the port director on Customs Form 3499 examine, sample, and repack or transfer merchandise in bonded warehouse. Where there will be no interference with the orderly conduct of Customs business and no danger to the revenue prospective purchaser may be permitted to examine merchandise in bonded warehouses upon the written request of the owner, importer, consignee, or transferee.
19 C.F.R. § 19.8. See also Declaration of Dawna J. Kutz, a Customs Service Fines, *1153 Penalties and Forfeiture Officer at 2 ("Any importer who makes such a request for testing purposes is permitted to sample merchandise that is under bond and/or seizure agreement or under a U.S. Customs hold.") (Attached as part of the CPSC's June 8, 1998, Suggestions in Opposition to Shelton's Motion For Summary Judgment on the Due Process Issue). There is also evidence in the record that the bonding/seizure agreements signed by fireworks importers permit them to sample merchandise after securing the permission of Customs. Id. See also Attachment to Exhibit A to Shelton's June 26, 1998, Response to the CPSC's Opposition Suggestions on Due Process issue (a "Constructive Seizure Agreement" for a fireworks importer indicating that "movement or use" of imported product is permissible with Custom's approval).
The court also notes that Shelton has not offered any evidence of thwarted attempts to conduct independent testing by it or any other importer. Absent such evidence, and in light of Mr. Gayman's trial testimony, 19 C.F.R. § 19.8 and the unrebutted testimony of Ms. Kutz, the court must rule this point against Shelton.
Shelton next argues a violation of due process because it is "impossible for any importer to properly respond to a LOA in 10 days." Shelton's Due Process Support Suggestions at 10. The CPSC counters, however, with evidence indicating that requests for extensions of time are routinely and regularly granted. See Deposition Testimony of Robert Poth at 133-34 (Attached as part of the CPSC's June 8, 1998, Suggestions in Opposition to Shelton's Motion For Summary Judgment on the Due Process Issue). Moreover, Shelton itself never asked for more time and has put forward no evidence suggesting that the CPSC has denied requested extensions in the past. The court therefore rules this argument against Shelton and stands by its earlier conclusion that constitutionally sufficient due process has been and is provided by the CPSC.

III. Products at Issue in the Corporate Proceedings.
Having rejected Shelton's due process argument, the court next must determine which corporate defendant is potentially liable for which products. The two corporate defendants are named on the invoices for Products 1-7 (Polaris) and 13 (Shelton Wholesale). On the other hand, Greg Shelton is listed on the invoices for Products 8-12 and 14-19.[9] The CPSC argues that liability for all of the products at issue may be placed at the feet of Shelton Wholesale because, regardless of the name on the invoice, all of the fireworks imported by any of the three defendants are ultimately sold by and through Shelton Wholesale. The CPSC is correct. See Tr. 350. In addition, evidence at trial established that Greg Shelton only rarely personally sells fireworks, and, in those few instances, is selling them only to family and close friends. Tr. 339, 350-53. The evidence also demonstrates that Polaris likewise transferred all of the fireworks it imported to Shelton Wholesale. See CPSC Ex. 35 at 18, ln. 16-24 (selected excerpts from Mr. Shelton's Deposition). In addition, Greg Shelton was the sole shareholder, officer, and director of Shelton Wholesale, and correspondence with the CPSC concerning all of the products was conducted by Greg Shelton as an officer of Shelton Wholesale. Tr. 428-41; CPSC Exs. 44A, 75-81, 85 and 87. For these reasons, the court has little trouble concluding that Shelton Wholesale is potentially liable for all nineteen products.[10]
As to Polaris, the CPSC argues that it is potentially jointly and severally liable with Shelton Wholesale for products 1-7 as a participant in the importation of those products. The court agrees. Nothing in the statutory language of the FHSA suggests that only one person may be found liable for the importation of a particular banned product. Analogous case law interpreting the Federal Food, Drug, and Cosmetic Act suggests that all those participating in the process should be held responsible for illegalities. *1154 See, e.g., United States v. Dotterweich, 320 U.S. 277, 284, 64 S.Ct. 134, 88 L.Ed. 48 (1943) ("The offense is committed ... by all who do have such a responsible share in the furtherance of the transaction which the statute outlaws, namely, to put into the stream of interstate commerce adulterated or misbranded drugs.").[11] The court finds Dotterweich persuasive and adopts that analysis for the FHSA statute in question. Accordingly, Polaris is potentially liable for Products 1-7.[12]

IV. Shelton's Attacks on CPSC's Testing Methods And Procedures.
Shelton lodges a variety of attacks on CPSC testing procedures. These deficiencies, Shelton argues, prevent the CPSC from proving that any of the products at issue in the Fine Case are banned or misbranded hazardous substances under the FHSA. In the NFA Case, Shelton argues that the deficiencies mandate entry of a declaratory judgment that the testing procedures are unlawful and void, and permanent injunctive relief preventing the CPSC from taking enforcement action against importers based on these testing methods. If Shelton's attacks are successful, the CPSC has failed to prove that Shelton imported defective products. On the other hand, if Shelton's attacks fail, Shelton is liable for importing defective products, see, e.g., CPSC Exs. 1-19, and the court will consider whether a penalty should be imposed and/or injunctive relief awarded.[13] The court will review each of Shelton's attacks in turn.

A. The CPSC Is Entitled To Deference.
Before analyzing Shelton's attacks, the court notes that many (if not all) of Shelton's attacks emphasize that there are either "better ways" of implementing the regulations at issue than the method selected by the CPSC, or that the CPSC is testing products not contemplated by a particular regulation. See Shelton's Post-Trial Brief at 12-31. From briefing, it appears that Shelton believes that the CPSC is not entitled to any deference in implementing, interpreting and enforcing the FHSA. The word deference is conspicuously *1155 absent from Shelton's submissions. Consistent with that apparent belief, Shelton did not appear to acknowledge that deference was appropriate at oral argument.
Contrary to Shelton's evident belief, however, the CPSC is entitled to a substantial amount of deference in interpreting the regulations and implementing their objectives. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) ("When the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order."). Review is for reasonableness only. Id. at 18, 85 S.Ct. 792. Even if the court would have adopted a better alternative of implementing a statute or regulation, the court is not permitted to substitute its judgment for that of the agency. See, e.g., Chevron U.S.A. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 n. 11, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). The deference afforded is particularly great when a court reviews agency decisions in technical and scientific areas. See, e.g., Troy Corp. v. Browner, 120 F.3d 277, 283 (D.C.Cir.1997) (courts should "review scientific judgments of the agency not as the chemist, biologist, or statistician that we are qualified neither by training nor experience to be, but as a reviewing court exercising our narrowly defined duty of holding agencies to certain minimal standards of rationality.") (internal quotations omitted); New York v. Reilly, 969 F.2d 1147, 1152 (D.C.Cir.1992).
In addition, the statutes and regulations interpreted by the CPSC were enacted to protect the public's health and safety. Statutes and regulations protecting the public health and safety are to be construed liberally. Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). As a result, the court considers that an even greater amount of deference to the CPSC's chosen methods and procedures is appropriate.[14]

B. Shelton's Attacks On CPSC Testing Methods And Procedures Fail.
Under this deferential standard, all of Shelton's attacks must fail. The court will discuss only the most vigorously advanced Shelton arguments in the following paragraphs.[15] Before doing so, it is appropriate to briefly review and summarize the tests the CPSC performed on the products at issue here:
1. for all devices "intended to produce audible effects," dissection of and weighing of the "flash powder" or report charge in each device. The report charge can be produced by no greater than 2 grains (130 milligrams) of pyrotechnic composition (the "amount test"). See 16 C.F.R. § 1500.17(a)(3).
2. for all "[r]eloadable tube aerial shell fireworks devices," measurement of width of shells with a caliper. The width can be no greater than 1.75 inches in outer diameter (the "size test"). See 16 C.F.R. § 1500.17(a)(11)(i).
3. "for all fireworks devices that require a fuse," one technician lights the fuse and a second technician times the period from the lighting of the fuse to the ignition of the device with a stopwatch readable to .1 seconds. The fuse burn time could be no more than 6 seconds and no less than 3 seconds (the "fuse burn test"). See 16 C.F.R. § 1507.3(a)(2).
4. for all "fireworks devices that require a fuse" that "weigh less than eight ounces," fastening two of the devices together, lifting one of the devices by its fuse, and checking to see if the fuse separates from the device (the "fuse attachment test"). See 16 C.F.R. § 1507.3(b).
5. for all devices, if "leakage of the pyrotechnic composition" was visually observed after gentle shaking, collecting and measuring all the material that leaked from the *1156 device (the "leakage test"). See 16 C.F.R. § 1507.5.
6. for all devices, lighting the device and visually observing its function to determine whether it "functioned in a normal manner without burnout or blowout" (the "burnout/blowout test"). See 16 C.F.R. § 1507.6.
7. for "rockets with sticks" (i.e., bottle rockets), clamping the part of the stick furthest from the driver to a board and measuring the stick's downward arch to determine whether the stick is rigid (the "rigidity test"). See 16 C.F.R. § 1507.10.
8. for "rockets with sticks" (i.e., bottle rockets), laying the stick on a flat surface and measuring the upward arch to determine whether the stick is "straight" (the "straightness test"). See 16 C.F.R. § 1507.10.
9. visually inspecting device to evaluate compliance with regulations requiring specific labels (the "label test"). See 16 C.F.R. § 1500.14(b)(7)(ix).

1. Fuse Burn Test.
Shelton first lodges a lengthy attack on the CPSC's fuse burn test. In conducting this test, one CPSC analyst lights the fuse with a punk while another analyst standing some distance away starts a stopwatch when he/she sees the fuse ignite. See Shelton's Post-Trial Brief at 12-13 (providing record citations); CPSC's Post-Trial Reply Brief at 10 (providing record citations). Shelton argues that the CPSC method is fraught with inaccuracy because the stopwatch holder is some distance (up to 20 yards) away and may not accurately see (or be signaled) that the fuse is lit, stops the watch when a "bang" is heard yet wears ear protection, and uses stopwatches calibrated by simultaneously starting and stopping two such watches (one in each hand) and comparing the times. See Shelton's Post-Trial Brief at 12-13.
The "better way" to test fuse burn times, according to testimony elicited from Shelton's expert witness Dr. Schneider, is to videotape the process of lighting the fuse and review the tape later for violations.[16] This method is accurate to 1/30th of a second, and almost completely eliminates the possibility of errors. See Shelton's Post-Trial Brief at 16-17 (providing record citations). Shelton also argues that fuse burn time measurements should be averaged. Id. at 13-16.
The court rejects Shelton's attacks. First, Shelton's argument fails to acknowledge that the CPSC makes some adjustment for human frailty by incorporating a .3 second margin of error. See CPSC Ex. 26 at 4-5; CPSC Ex. 67; Tr. 189-92. In other words, only fuse burn times falling below 2.7 and above 6.3 (or 9.3) seconds[17] are considered failures. CPSC Ex. 26 at 5. Shelton also fails to acknowledge that the CPSC method considers the safety of its personnel in testing, by permitting ear protection and some distance between the device and the stopwatch holder. And, while it would obviously be preferable to videotape the process, doing so would take considerably more time, money and effort.
Shelton's attack also fails to acknowledge that Mr. Neal Gasser, who conducts most of the CPSC fireworks testing, Tr. 174, testified in his deposition that the stopwatch holder is within 10 feet of the device for large devices, within 3-4 feet for smaller devices and that in his experience hand signals were not used.[18]See CPSC's Post-Trial Reply Brief *1157 at 10 (providing record citations). The court finds Mr. Gasser's testimony particularly instructive on this point, and far more persuasive than the composite sketch Shelton compiled from selected portions of deposition testimony of three other CPSC employees.[19] For the reasons stated above and those set out in the CPSC's briefing, the court rejects Shelton's composite sketch. See CPSC's Post-Trial Reply Brief at 10-12.
Shelton's argument that the CPSC should average the results obtained would undermine the primary purpose of the FHSA and implementing regulations, to-wit, ensuring the safety of the consuming public. Under Shelton's argument, if a sample of eight yielded four devices that exploded instantaneously upon lighting and four devices that exploded ten seconds after lighting, the product would pass CPSC testing and extremely dangerous devices would be offered for public consumption.[20]
Shelton's argument that the CPSC's method of calibrating stopwatches is inappropriate must also be rejected. Shelton presented no evidence that the stopwatches used by the CPSC were or are in fact inaccurate.
Shelton's videotape method would obviously be a more accurate method of measuring fuse burn times. That is not, however, the point. Rather, the only question for the court is whether the CPSC methodology is so inexact and unreasonable as to justify judicial intervention. For the reasons stated above, the answer to that question is clearly no.

2. The Rigidity Test.
Shelton also attacks the CPSC's bottle rocket rigidity test. The rigidity test, which involves measuring the bottle rocket stick's flexibility, is the CPSC's method of implementing 16 C.F.R. § 1507.10, which requires that bottle rockets "utilize a straight and rigid stick to provide a direct and stable flight." Shelton argues that the rigidity test does not measure direct and stable flight and that the "better way" of determining whether a rocket flies direct and stable would be to launch the selected bottle rockets into the air. See Shelton's Post-Trial Brief at 23-27.
Having reviewed the evidence on this point, the court cannot conclude that flexibility of the "guidance stick," as the bamboo shoot was termed by Dr. Schneider, has no impact on a bottle rocket's flight. It may be true that a curvature does not create danger of a "curve ball." But the CPSC's bottle rocket study confirms that stick straightness and rigidity correlates directly with the flight trajectory of bottle rockets. See CPSC Ex. 68 at 10-14.[21] Indeed, Dr. Schneider conceded at trial that the more straight and rigid the stick, the more likely that a bottle rocket will have a direct and stable flight. Tr. 977.[22] In addition, Shelton's method firing rockets into the air and observing their flightinvolves safety and fire issues not *1158 present with the CPSC's chosen procedure. Tr. 241. Finally, the court notes that Shelton's method is more subjectiveand thus prone to errorthan the method selected by the CPSC. For these reasons, the CPSC's method of testing for direct and stable flight survives this court's judicial scrutiny.

3. The Leakage Test.
Shelton's attack on the leakage test centers on the CPSC's alleged failure to distinguish between pyrotechnic composition and any other composition which may be found in the carton or bag, such as black powder from fuses, and that may actually be the cause of the ignition when the material collected from the bag or carton is exposed to flame. See Shelton's Post-Trial Brief at 27-28; Tr. 238. See also CPSC Ex. 26 at 13. Shelton argues that language of 16 C.F.R. § 1507.5 centers the inquiry only on leakage from the "pyrotechnic chamber in a fireworks device" and that the CPSC should therefore discern in the lab whether the material found in the bag or carton is pyrotechnic composition from the chamber.
Shelton's attack must be rejected. While the language of the regulation does suggest measuring only leakage of pyrotechnic material from the device's chamber, the underlying purpose of the regulation is much broader. The objective of the test is to ensure that devices don't leak highly flammable material that could form the ignition source of a fire generally, or the fuses of devices stored in the carton or bag specifically. Whether that ignition source is comprised solely of material from a device's chamber, or also from leaking fuses, the risk exists.[23] The CPSC's test addresses that risk. For this reason, the court does not believe that the CPSC's implementation of the regulation is unreasonable.

4. The Amount Test.
Shelton also attacks the CPSC's decision to take enforcement action on Products 5, 17 and 19 based on alleged violations of the "amount test." See 16 C.F.R. § 1500.17(a)(3). Both sides agree that this regulation bans fireworks devices if they are intended to produce audible effects and the audible effect is produced by a charge larger than 2 grains (130 milligrams). Id. (applying to devices "intended to produce audible effects (including but not limited to cherry bombs, M-80 salutes, silver salutes, and other large firecrackers, aerial bombs, and other fireworks designed to produce audible effects ...)...."). Shelton argues that the regulation does not extend to "devices intended to produce visual effects." Shelton Post-Trial Brief at 18.
Both sides agree that products 5, 17 and 19 are devices that produce aerial visual displays. See Shelton Post-Trial Brief at 20; CPSC's Post-Trial Reply Brief at 15-17. Nevertheless, the CPSC argues that the regulation may be applied to these products. The court agrees. Shelton's argument inappropriately suggests that a given device may have only one intended effect, either visual or aerial. This is not accurate. A device may have more than one intended effect, and the CPSC's decision that a particular device is designed to have an audible effect, and thus is subject to the "amount test," would be and is entitled to substantial deference.[24] Warren Porter testified at trial that the CPSC determines whether a device is intended to produce an audible effect by firing the device and determining whether it goes "pop" or "poof" when the visual effect (generally stars) is seen or "boom" or "bang" when the visual effect occurs. Tr. 253. The CPSC measures only the material causing the "boom" or "bang." Tr. 252. Shelton has not presented any evidence suggesting that the only intended effect of Products 5, 17 and 19 is visual.[25]
In addition, the same answer the court gave to Shelton's leakage test argument (i.e., *1159 igniting not just pyrotechnic chamber material but also fuse powder is a permissible interpretation of the regulation because the regulation's purpose is to prevent unintended and accidental ignition of loose powder from fireworks devices while still in the box) may be made in part answer to Shelton's attack on the CPSC's use of the "amount test" to find violations of Products 5, 17 and 19. While it may be true that the primary function and design of these devices is to explode while above the ground a good distance, accident, misuse, or product failure may result in those products being at or around ground level at the time the device explodes. By measuring the amount of pyrotechnic material used in creating the explosion of these devices (so that, among other things, the stars may be expelled from the cartridge), the CPSC provides a modicum of protection against the risk of consumer injury from accident, product failure, and misuse.
For these reasons, it is not unreasonable for the CPSC to test the amount of pyrotechnic material causing the "boom" in devices that also (or primarily) produce visual effects. Shelton's attack on the CPSC's decision to subject to the "amount test" those products that while producing an aerial and visual display also have an audible effect must therefore be rejected.

5. The Label Test.
Shelton next attacks the CPSC's reading of 16 C.F.R. § 1500.14(b)(7)(ix) as requiring a label on every ball. See Shelton's Post-Trial Brief at 28-30. The court previously ruled this point against Shelton. See April Order at 22. Indeed, at that time, the court specifically noted that Shelton's briefing did not make an issue of the regulation's interpretation. See id. at n. 27.
Even if the court were inclined to overlook Shelton's earlier waiver of this issue, which it is not willing to do, the point must be ruled against it. The CPSC's interpretation of the regulation to require a label on every ball in Product 10 is reasonable and is entitled to deference. Trial testimony indicates that the balls comprising Product 10, "small festival balls," (a reloadable mortar-type device) may be ignited separately, Tr. 421 and 518, thus suggesting that a warning label would be and is appropriate on each individual ball and not just the outer packaging.[26] Indeed, the other "small festival balls" product at issue in this case (Product 8) was properly labeled, as were the other reusable mortar and shells products in this case, Products 1, 4, 6, and 11. See CPSC Exs. 1, 4, 6, 8 and 11 (no label violation noted). Shelton has failed to reconcile the fact that the other similar products at issue in this case were individually labeled with their legal argument that the CPSC misinterprets this regulation.

6. Sampling For The Straightness and Rigidity Tests.
Shelton renews its attacks on the CPSC's method of selecting the most crooked and least flexible bottle rockets for the sub-samples used in the straightness and rigidity tests. See Shelton's Post-Trial Brief at 20-23. In the April Order, the court concluded that a disagreement between the expert witnesses over whether valid statistical inferences could be drawn when the subsamples were not randomly selected would have to be resolved at trial. See April Order at 17-18. The apparent disagreement, however, never materialized at trial. The CPSC's expert witness, Dr. Richard Madsen, testified that valid statistical inferences could be drawn from a non-randomly selected sub-sample if the number of products in the entire sample (120) were used to calculate the statistical inferences rather than the *1160 number of products in the sub-sample (12). Tr. 277. See also Tr. 273-78; 300.[27] The result of such treatment is that the range of possible defective products increases at a given confidence interval.[28] Tr. 274-76. Dr. Chen did not disagree with this analysis. Cf. Tr. 1012-14. Furthermore, both experts apparently agreed that a valid statistical inference could not be drawn if the sub-sample size (12) was used to figure the range of percentage of defective products in the entire shipment. Id.; Tr. 273-74; 301-02; 308-10.
Shelton contends that the CPSC devised this analysis "for purposes of this litigation in attempt to salvage what is clearly an unsupportable sampling program." Shelton's Post-Trial Brief at 21. While it may be that the CPSC devised this strategy during litigation, the court need not resolve the question. The fact remains that valid statistical inferences may be drawn from the larger sample size. In addition, in response to the court's questions, Dr. Madsen testified that non-random selection at the sub-sample level (as opposed to the initial sample level, which would render any results reached invalid) is not "novel," but instead represents "a pretty basic application of standard procedure." Tr. 298-99; 308. The key, he stated, is "to get the right denominator. The denominator is 120 and not 10." Tr. 309-10.
In addition, the court considers it important that there is no evidence in the record suggesting that the CPSC requires a certain percentage of crooked or flexible sticks before a product is considered a banned hazardous substance. On the contrary, Mr. Schoem testified that "there is no threshold" percentage above which the CPSC will take enforcement action and below which a shipment of product will be deemed legal and not banned. Tr. 100. He testified that "Under our regulations all products are required to comply with our regulations." Id. Moreover, Shelton does not argueand there is no evidence before the courtthat the CPSC would not have taken enforcement action (i.e., exercised its enforcement discretion) on such a product if faced with two (or so) defective products out of 120 sampled. This point is ruled against Shelton.

7. The Size Test.
Shelton also takes issue with the CPSC's size test, which involves determining the widest possible diameter. See Shelton's Post-Trial Brief at 30-31; Tr. 244-45. Shelton's principal argument is that the size of a shell should be measured in a "better way," using the circumference of the shell to determine the shell's diameter, instead of using the largest diameter of the shell as measured by a micrometer. See Tr. 970-71. Shelton also argues that the minor violation here, .03 inches too large, is insignificant. See Shelton's Post-Trial Brief at 30-31.
The CPSC's defense of its measurement technique, that if a shell is too wide in any direction it could get stuck in the tube and explode on the ground, see CPSC Post-Trial Reply Brief at 28-29, is reasonable and entitled to deference. It also comports with a purpose of the regulation, the prevention of injuries. And, since even a shell only slightly too large in diameter could conceivably cause problems, Shelton's "minor violation" attack on the CPSC's size test must be rejected.

*1161 V. Shelton "Knowingly" Violated the FHSA.
Having determined that Shelton's attacks on CPSC testing procedures fail, and consequently the validity of the CPSC findings as to each of the products at issue in this case, the court must evaluate the appropriateness (Section V) and amount (Section VI, infra) of a fine for the violations. The civil penalty provision of the FHSA, 15 U.S.C. § 1264(c)(1), provides in pertinent part:
Any person who knowingly violates section 1263 of this title shall be subject to a civil penalty not to exceed [$5,000 or $6,000] for each such violation ... [A] violation of subsection (a) of section 1263 of this title shall constitute a separate offense with respect to each substance involved, except that the maximum civil penalty shall not exceed [$1,250,000 or $1,500,000] for any related series of violations.[29]
As that term is used in § 1264(c)(1), "knowingly" is defined as:
(A) having actual knowledge, or (B) the presumed having of knowledge deemed to be possessed by a reasonable person who acts in the circumstances, including knowledge obtainable upon the exercise of due care to ascertain the truth of the representations.
15 U.S.C. § 1264(c)(5).
Both sides agreed at oral argument that no cases have interpreted § 1264(c)(1).[30] The CPSC does not contend that Polaris or Shelton Wholesale possessed actual knowledge that the fireworks at issue here violated the FHSA at the time they entered the United States. See CPSC Post-Trial Brief at 11. The focus is instead on subsection (B). Id. It is far from a model of drafting clarity. Consistent with the court's general understanding of presumed knowledge, as used in other contexts, the court interprets Subsection (B) as imputing knowledge when a person fails to act reasonably in the circumstances, such as when they do not exercise due care. See generally Aimone, 601 F.Supp. at 513 (interpreting identical language found in 15 U.S.C. § 2069); Eighth Circuit Manual of Model Criminal Jury Instructions § 7.04 (1996) (jury may find defendant acted "knowingly" if he "deliberately avoided learning the truth" or "deliberately closed [his] eyes to what would otherwise have been obvious").[31]
The CPSC argues that there are several methods of exercising due care. See CPSC Post-Trial Brief at 11-16. Two involve testing the fireworks imported from China: (1) importers can test their own products for compliance with CPSC regulations, both the ones that the CPSC tests and the ones that it does not ("self-testing"); (2) importers can have their fireworks adequately tested, pre-export, in China ("third-party testing"). See CPSC Post-Trial Brief at 11-14 (self-testing); id. at 14-15 (third-party testing). Third-party testing, the CPSC argues, can be accomplished by either having the supplier test the products it is supplying *1162 or hiring a third-party testing service, such as American Fireworks Standards Laboratory ("AFSL"). Id. at 14-15. The CPSC argues that testingboth self and third-partyserves to educate an importer about the relative compliance rates of different fireworks sold by different suppliers. Id. at 12. The CPSC also suggests that members of the American Pyrotechnics Association ("APA") are exercising some measure of care in the importation of fireworks. The APA disseminates a testing manual containing standards identical to the standards in the CPSC's regulations, advises its members of upcoming and current government regulations, and advises its members how to comply with CPSC regulations. Id. at 12-13 (providing record citations).
The CPSC argues that Shelton did not exercise due care. CPSC's Post-Trial Brief at 16-18. Evidence of the lack of due care, the CPSC argues, is found in the fact that Shelton does not generally test the products it imports for compliance with CPSC regulations. Id. at 12 (providing record citations).[32] Further evidence is found in Shelton's failure to cease doing business with Hop Kee Pyrotechnics, Inc. ("Hop Kee"), a broker/exporter whose products (which may come from numerous manufacturers in China) have repeatedly failed CPSC testing and from whom Shelton continues to import the vast majority of its fireworks. Id. at 18-19. In addition, Shelton does not belong to the APA, Tr. 379, belong to any organization that conducts testing, Tr. 381, employ a safety or quality control director as do some other members of the NFA, compare CPSC Ex. 35 (Shelton Deposition) at 42-45; with CPSC Ex. 30A (Collar Deposition) at 42-45, utilize the services of the AFSL, Tr. 381, ask its main suppliers to conduct CPSC compliance testing, Tr. 383 and 751-52, or have any written test or quality control procedures, Tr. 376-77. See also CPSC Post-Trial Brief at 16-20 (providing additional record citations); 13-14 (outlining compliance activities of other NFA members; providing record citations).
Each time one of Shelton's products failed a CPSC test, the CPSC argues, Shelton had choices. They could have initiated a rigorous self-testing program, hired a third-party testing service, joined the APA, changed broker/exporters, demanded that the broker/exporter obtain products from a particular factory and/or complained to the broker/exporters and pressured them to obtain products that would not fail the CPSC regulations. A reasonable person would have done something, the CPSC argues, and Shelton did nothing. See CPSC Post-Trial Brief at 16-20. In short, the CPSC argues that Shelton chose to remain essentially ignorant of the quality of the fireworks imported and of the likelihood that fireworks obtained from any particular source would comply with the CPSC's regulations. The contention is that this is not reasonable, evidences a lack of due care and renders Shelton's violations of the FHSA "knowing."
In response, Shelton makes several arguments. See generally Shelton's Post-Trial Brief at 33-40. Shelton argues first that Products 1-7 were in fact tested in China by the supplier, see CPSC Exs. 1A-7A (invoices noting "Quality Testing" fee), and that there could thus be no knowing violation. See Shelton's Post-Trial Brief at 38. Shelton also argues that no civil penalties should be imposed for Products 1-7 because they were all imported in late March or early April 1992, and Shelton would have had no way of knowing that any of the products would be found defective, or any reason to think that some action on its part was necessary. See Shelton's Post-Trial Brief at 38.
*1163 Shelton further argues that although Products 1-7 could possibly form a basis for imputing knowledge for later shipments of products, such an analysis does not hold up on the facts of this case. See Shelton's Post-Trial Brief at 38-40. For example, products 1-4 were imported through broker/exporter Interoriental, yet none of the other violative products (8-19) were imported from that broker/exporter. Compare CPSC Exs. 1A-4A with CPSC Exs. 8A-19A. Also, Product 10 was imported through broker/exporter Panda and Product 13 through broker/exporter Anco, but no other products at issue were imported through either of them. Compare CPSC Exs. 10A and 13A with CPSC Exs. 8A-9A, 11A-12A and 14A-19A. And, Shelton argues, although Products 5-6[33] were imported through broker/exporter Hop Kee, and so were later products (specifically 8-12, including Hop Kee's related company, broker/exporter Sunlight China), none of the later products at issue imported through Hop Kee failed the same CPSC test or were the same products previously found to violate the CPSC regulations. Compare CPSC Exs. 5C-6C and 5D-6D with CPSC Exs. 8C-12C and 8D-12D. Shelton argues that it defies logic to impute knowledge to it when Product 6 from Hop Kee failed a leakage test and three years later Product 17 from Hop Kee failed the fuse burn test. See Shelton's Post-Trial Brief at 39. Shelton also argues that pre-shipment testing may accomplish little because the fireworks can be damaged in transit, either by humidity, mishandling, shifting or crushing. See Shelton's Post-Trial Brief at 34, n. 10.
The court agrees that the evidence fails to demonstrate, as to Products 1-7, that Shelton did "knowingly" import banned hazardous substances. There is no specific evidence that Shelton possessed information prior to that time that would have caused a reasonable person to take steps to ensure compliance with CPSC regulations.[34] Absent from the record is evidence that Shelton had prior run-ins with the CPSC, had itself discovered that fireworks it imported would have failed CPSC testing or evidence that Shelton was otherwise aware of the possibility that its fireworks may be found deficient. In other words, at the time Products 1-7 were found violative Shelton had no reason to have implemented a self-testing program, utilize third-party testing, join the NFA, implore its suppliers to ship only CPSC-compliant products, or take any other action to avoid importing violative fireworks. For this reason, the importation of nonconforming Products 1-7, each of which was a banned hazardous substance, was not "knowing" under § 1264(c)(1).[35]
Having said that, however, the court accepts the CPSC's arguments and concludes that Shelton's other arguments must be rejected. After April 1992, Shelton cannot profess ignorance about importation risks or CPSC regulations. Shelton was armed with sufficient information to do something to try and prevent a repeat occurrence. Shelton instead chose to do nothing.[36] There is, for *1164 example, no evidence that Shelton notified its broker/exporters of the problems that occurred. Such a step would have been particularly appropriate to take with respect to Hop Kee, from whom Shelton ordered about 85% of its fireworks, Tr. 383, and from whom two of the products sampled by the CPSC in 1992 failed testing. See CPSC Exs. 5A and 6A. Shelton also could have joined the APA, enrolled in the AFSL testing program, instituted its own CPSC compliance testing program, insisted that its suppliers conduct CPSC compliance tests, or taken some other step(s) to help ensure the delivery of regulation-compliant products.
Obviously, any steps that Shelton may have taken would not have been foolproof. It is undisputed that problem fireworks will always slip through the cracks.[37] Problems in transitproduct crushing, humidity, etc. are always a potential problem. Testing either self or third-partycan never change that. Problem fireworks may slip through the AFSL, supplier and/or self-testing net. That this is true, however, is not the point. The point is that Shelton chose not even to try to comply with CPSC regulations after being put on notice that the potential for problems existed. A reasonable person in Shelton's position would have done something to ensure that the problems did not reoccur. In short, while fireworks devices that will fail CPSC testing will still be imported despite the prevention measures discussed above, at least the importer has taken some reasonable steps to keep the number of violative products to a minimum.[38] That is probably all that the law requires, at least as enforced by the CPSC.
It is no answer to say, as Shelton does, that no product ever failed the same test in the same way and that the importation of each particular banned product could not have been "knowingly" done. The point is, rather, that Shelton failed to take any steps to comply with the law. Under the logic of Shelton's argument, an importer could avoid a "knowingly" violation for decades simply by shifting amongst the various suppliers, changing the products ordered from each and trusting that the CPSC never uncovered the same exact violation on the same exact product from the same exact supplier (the odds of which are incredibly low considering the CPSC's limited enforcement resources and the number of imported products).

VI. The Fine.
The court must next determine the appropriate fine for Shelton's knowing violations of the FHSA. United States v. Advance Machine Co., 547 F.Supp. 1085, 1094 *1165 (D.Minn.1982) ("the amount of the penalty will ultimately be a matter for the Court."). Both sides apparently agree that the maximum fine in this case is $1,500,000, the maximum amount that may be imposed for a series of related violations. See CPSC's Post-Trial Reply Brief at 35; Shelton's Post-Trial Brief at 41. The CPSC appears to believe a fine of $1,500,000 would be appropriate on the facts of this case. Shelton argues that only a nominal fine should be imposed.
To begin, the court must determine the appropriate method of calculating the fine. Three basic methods of calculating the fine are at least arguably appropriate: (1) one violation for each "banned" product shipped, for a total of 9 violations (19 products total less products 1-7, 9, 13 and 18); (2) one violation for each shipment containing a "banned" product, for a total of 7 violations; and (3) one violation for each defective fireworks device contained in a particular shipment of product that failed CPSC testing. See generally Shelton's Post-Trial Brief at 42.
The CPSC argues in favor of the third approach, while Shelton argues for the second approach.[39] Because the second approach incorrectly fails to consider that there may be multiple products within a shipment violative of the CPSC and because it fails to recognize that a particular product may fail several CPSC tests, the court declines Shelton's invitation to adopt it. The court also finds the first approach an inappropriate method of calculating the fine. As the products at issue here demonstrate, a particular product may be comprised of anywhere from several hundred to several million individual devices. The potential harm to the end users varies with the number of devices in a particular shipment.
As described below, the third method is the most logical as well as the fairest measure of the appropriate fine. It also has the added benefit of comporting with 15 U.S.C. § 1264, which provides that a "separate offense" occurs "with respect to each substance involved." A "hazardous substance" is defined as "Any substance or mixture of substances which ... is flammable or combustible." 15 U.S.C. § 1261(f)(1)(A). Since each fireworks device is flammable or combustible, each device constitutes a separate offense.
Under this method, the failure rate within the sample permits drawing statistical inferences about the failure rate within the population as a whole at the 90% confidence level.[40] Using the failure number at the low end of the confidence interval, which represents not only a conservative but also fair method of proceeding, a total fine amount may be arrived at by multiplying the per device fine (see infra) by the total number of failures within the shipment of product. See CPSC Ex. 42 (revealing the number of violations at issue for each product). As revealed in CPSC Ex. 42, the total number of defective products imported is 142,328.[41] The court has previously determined that only 117,303 of them (the failed devices in Products 8, 10-12, 14-17 and 19) may be utilized in figuring the penalty.[42]
It remains to be decided how much of a fine per imported defective device is appropriate. Under 15 U.S.C. § 1254, the CPSC must take into account certain criteria in calculating the amount of fine to be sought:
In determining the amount of penalty to be sought upon commencing an action seeking to assess a penalty for a violation of section *1166 1263 of this title, the Commission shall consider the nature of the substance, the severity of the risk of injury, the occurrence or absence of injury, the amount of the substance distributed, and the appropriateness of such penalty in relation to the size of the business or person charged.
Although these factors are directed to the CPSC and not the court, they are helpful in guiding the court's analysis and should, if applicable on the facts of a particular case, be considered in determining the amount of penalty.
Given the nature of fireworks as explosive devices, the severity of the risk of injury would seem to be high. There is, however, no evidence before the court that any injuries have occurred. As testimony at trial established, Shelton Wholesale reaped very large profits and should have the ability to pay a large fine.[43] Tr. 582-83.
Considering the several-year period of repeated violations, Shelton's continued use of broker/exporter Hop Kee without any apparent attempt to induce Hop Kee into making improvements in the products it provided Shelton, Shelton's failure to implement any meaningful CPSC compliance self-testing program or use supplier or other third-party CPSC compliance testing, or take other steps (hire a quality control director, join the APA, etc.) to correct problems, the court might normally settle on a per device fine amount of $3.00, for a total fine of $351,909.
It is my understanding, however, that this is not a routine fine-collection litigation. It is apparently a test-case, for which the industry has not previously prepared. It has been unusually costly to defend. Under these special circumstances I will use a fine of $100,000.[44]
Consistent with this court's ruling earlier in this opinion that Shelton Wholesale is responsible for all of the Products at issue in this case, see supra, the entire amount of the fine will be and hereby is levied against Shelton Wholesale. Consistent with Mr. Polonica's testimony at trial that Shelton Wholesale could not pay a lump sum fine amount, Tr. 575, Shelton Wholesale will be permitted to remit this sum to the United States in equal annual installments over the next four years with the first installment due and owing on August 1, 1999.[45] In light of the court's ruling supra that the importation of Products 1-7 was not "knowing" and, independently, because of Mr. Polonica's testimony at trial that Polaris is not in a position to pay a fine, Tr. 574, the court will not impose a fine on Polaris.

VII. The CPSC Is Entitled To Injunctive Relief.
The CPSC also seeks relief in the form of an injunction against further importation of violative products. The FHSA authorizes such relief. See 15 U.S.C. § 1267(a). When the Government seeks an injunction pursuant to statute to protect the public health, the requirements applicable to private litigants in equity do not apply. See United States v. W.T. Grant Co., 345 U.S. 629, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); United States v. City of Painesville, Ohio, 644 F.2d 1186, 1193 (6th Cir.1981). The Government need not show irreparable harm, W.T. Grant, 345 U.S. at 633, 73 S.Ct. 894, or inadequate remedy at law. City of Painesville, 644 F.2d at 1193. Moreover, because the availability of injunctive relief in the statute reflects a congressional finding that the balance of the equities tips in favor of injunctive relief, the court need not balance the equities. See Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944) (in statutory injunction case, "the standards of the public interest not the requirements of private litigation measure the propriety and need for injunctive relief"). The Government meets its burden for injunctive relief upon establishing that a violation of the statute has *1167 occurred and that there is some likelihood that future violations may occur. See W.T. Grant, 345 U.S. at 632, 73 S.Ct. 894. The availability of injunctive relief in a federal statute such as the FHSA reflects the finding of Congress that a violation of the statute will result in harm to the public, and should be restrained. See United States v. Diapulse Corporation of America, 457 F.2d 25, 28 (2d Cir.1972).
Shelton's history of past violations of the FHSA and the likelihood that it will continue to violate the FHSA warrant injunctive relief.[46] The threat of recurrent violations is apparent in the recalcitrance of Shelton after repeated notifications of violations by the CPSC. Unless enjoined by the court, Shelton may well continue its violative conduct, and continue to expose the public to the risks associated with violative fireworks. Therefore, Shelton Wholesale and Polaris will be and hereby are enjoined from knowingly[47] or recklessly importing fireworks devices violative of any and all CPSC regulations.

VIII. Conclusion.
For the reasons stated, it is hereby
ORDERED that judgment is entered in favor of the CPSC and against Shelton Wholesale in the Fine Case (96-6131-CV-SJ-6). It is further
ORDERED that judgment is entered in favor of the CPSC and against Polaris in the Fine Case (96-6131-CV-SJ-6). It is further
ORDERED that Shelton Wholesale shall pay a fine to the United States in the Fine Case (96-6131-CV-SJ-6) of $100,000, with the first of four equal annual installments due on August 1, 1999. It is further
ORDERED that both Shelton Wholesale and Polaris are enjoined from knowingly or recklessly importing products violative of the FHSA and/or the CPSC regulations. It is further
ORDERED that Shelton's motion for summary judgment on Count V in the NFA Case (97-6021-CV-SJ-6), Shelton's due process claim, is denied. Judgment is entered in favor of the CPSC on Count V of the NFA Case (97-6021-CV-SJ-6).
NOTES
[1] The court will not in this Memorandum and Order restate the factual background. For that basic discussion, see April Order at 2-6. Consistent with Federal Rule of Civil Procedure 52(a) and to the extent made necessary by Shelton's largely legal challenges and defenses, the court will find the facts and make conclusions of law throughout this Memorandum and Order.
[2] For consistencies sake, this Memorandum and Order will continue to use "Shelton" to refer to the non-governmental parties in these two related cases. The court does note, however, that Mr. Greg Shelton, who requested a jury trial in his answer to the CPSC's complaint, was severed from the May trial. See May 1, 1998, Order.
[3] The court reserved ruling on whether such non-random sampling may nevertheless be found legal. Id. at 17, n. 21. Shelton is apparently satisfied by the trial testimony on this question. See Tr. 97 (Mr. Schoem testified that a device that was "obviously violative" would be collected, but "it would not be part of the random sample.") It failed to raise the point again in post-trial briefing or at oral argument. This point will not be discussed further in this Memorandum and Order.
[4] This contention has apparently been dropped by Shelton. It was not brought out at trial, is not mentioned in Shelton's post-trial briefing and was not discussed at oral argument. It will not be discussed further in this Memorandum and Order.
[5] The court need not resolve this question, as Shelton possesses a constitutionally protected property interest in the imported fireworks subjected to CPSC testing and found deficient.
[6] Whether the statutory and regulatory language in question was or is violated by the CPSC is not before the court.
[7] Shelton did not introduce any evidence at trial suggesting that LOA's supplied in other circumstances or to other importers do not include a similar notice.
[8] The court is not convinced that the CPSC's failure to memorialize this practice in writings submitted to the importer (see Tr. 134) undermines its constitutional effectiveness. According to Mr. Schoem's uncontroverted testimony, the CPSC is receptive to requests for review on high. Tr. 134. Shelton submitted no evidence that it sought such a review and was rebuffed. In the context of industry operations it is understandable that regulated parties may have little interest in making a "federal case" out of claimed violations.
[9] For a complete listing of the products, see Appendix A to this court's April Order.
[10] Shelton Wholesale cannot escape potential liability simply because the products ordered by Mr. Shelton or Polaris may not have actually been transferred to Shelton Wholesale. It is sufficient that in the general and usual course of events, Shelton Wholesale is the end-distributer of fireworks products imported from China by itself, Polaris or Mr. Shelton. Tr. 350.
[11] Although the court's holding as to Polaris suggests that Mr. Shelton may experience some difficulty in attempting to avoid responsibility for products imported under his name, the court makes no finding in this regard. A motion for sumary judgment might allow resolution of personal liability without a jury trial replicating much of the evidence previously heard. Alternatively, the CPSC may attempt to circumvent a jury trial for Mr. Shelton by seeking enforcement of any judgment against Polaris and Shelton Wholesale through a veil-piercing proceeding. The court expresses no opinion on the procedural or substantive merits of such a strategy.

The court does note that the general presumption is that a subsidiary corporation is legally separate from its parent corporation and shareholders. Williams v. McAllister Brothers Inc., 534 F.2d 19, 21-22 (2d Cir.1976). However, "a strict adherence to common law principles is not required in the determination of whether a parent should be held for the acts of its subsidiary, where strict adherence would enable the corporate device to be used to circumvent the policy of the statute." United States v. Firestone Tire & Rubber Co., 518 F.Supp. 1021, 1039 (N.D.Ohio 1981) (quoting P.F. Collier & Son Corp. v. FTC, 427 F.2d 261, 267 (6th Cir.1970)). The law will not recognize corporate formalities used to circumvent a statutory policy or to violate a law. Id. Thus, where a violation of law is perpetrated through a corporate entity, the courts will intercede to hold the shareholder or parent corporation liable. See Van Wyk v. Bergland, 570 F.2d 701, 705 (8th Cir.1978) (quoting Bruhn's Freezer Meats v. United States Department of Agriculture, 438 F.2d 1332, 1343 (8th Cir.1971) ("[T]he corporate entity may be disregarded when the failure to do so would enable the corporate device to be used to circumvent a statute.")). Nevertheless, the court leaves the issues related to Mr. Shelton for another day.
[12] As an aside, the court notes that the CPSC does not contend that Polaris is jointly and severally liable for Products 8-19. The CPSC did not put on evidence suggestive of Polaris participation respecting the importation of Products 8-19. Furthermore, veil-piercing between the two corporations is not urged by the CPSC, and no evidence was put forward directly bearing on that subject. Polaris' potential liability is, therefore, limited to products 1-7.
[13] The court is somewhat mystified by Shelton's largely unexplained argument that the CPSC "presented virtually no expert evidence of defective product." Shelton's Post-Trial Brief at 10. The court fails to discern why the CPSC needed to present expert testimony in support of its test results. The results themselves were admitted into evidence at trial, see CPSC Exs. 1-19; Tr. 76, 178, 417, 419, which is sufficient to shift the burden to Shelton to present evidence as to why the results are in error. Shelton attempted to do this in a general fashion (as opposed to specifically attacking the results achieved as to a particular product at issue in this case) through its experts, Dr. Schneider and Dr. Chen.
[14] It may be worth noting, however, that judicial deference is neither blind nor deaf. Some of Shelton-NFA testimony and contentions were persuasive, and occasionally the CPSC, with its myriad responsibilities, seemed somewhat out of its depth. Although the agency is largely successful here, it is to be hoped that this litigation has been a useful learning process for the agency, and will promote some useful reformsperhaps in cautious cooperation with regulated parties and knowledgeable persons. I acknowledge being well impressed by Dr. Schneider.
[15] The court has previously disposed of some of Shelton's attacks and does not (except in a couple instances) repeat that analysis here. See April Order at 16-18 and 20-22.
[16] As it did before trial, the court rejects the CPSC's attempt to exclude from consideration Dr. Schneider's testimony. See CPSC's Post-Trial Brief at 28.
[17] The upper limit was changed from 6 to 9 seconds after the fireworks in this case were imported. See Tr. 192; 61 Fed.Reg. 67200 (noting December 20, 1996, amendment to 16 C.F.R. § 1507.3(a)(2) lengthening upper time limit to 9 seconds). None of the fireworks devices at issue in this case involve the upper limit. Tr. 192.
[18] Shelton's efforts to exclude Mr. Gasser's testimony from this court's consideration must fail. Shelton is the party who admitted Mr. Gasser's entire deposition (with designations and counter-designations to follow in accordance with the court's established post-trial schedule) in the first place. See Tr. 1074. Subsequently, however, Shelton did not designate testimony from Mr. Gasser's deposition. The court concludes that the CPSC properly cited and relied upon Mr. Gasser's testimony in its June 2, 1998, filing of counter-designations responding to the composite sketch of fuse burn testing procedures set forth by Shelton's May 26, 1998, deposition designations of three other CPSC employees (see infra, note 19).
[19] Shelton's argument relies on selected testimony from three CPSC employees. See Shelton's Post-Trial Brief at 12-13 (relying on deposition testimony of Sonenthal, Chen and Booshan).
[20] Shelton argues that the CPSC's Fireworks Testing Manual ("Testing Manual"), CPSC Ex. 22 at 9, requires that fuse burn times be averaged. See Shelton's Post-Trial Brief at 15. Shelton is correct that the Testing Manual states: "Calculate average, standard deviation and range and record the data on the FT report." CPSC Ex. 22 at 9. See also Tr. 217-18. That the analyst is directed to make and report such calculations (which, as an aside, did not occur for any of the products at issue in this case) does not, however, mean that the CPSC must base its enforcement decisions on such data. The regulation at issue, 16 C.F.R. § 1507.3(a)(2), does not mandate the use of averages.
[21] Although the court at trial expressed some reservations about the admissibility of this study, it concluded at oral argument that the study could be admitted into evidence under Federal Rule of Evidence 803(8)(C). See also CPSC's Post-Trial Reply Brief at 22-24 (citing case law interpreting 803(8)(C)).
[22] Although the court does not recall the parties mentioning or debating this, it seems to the court that the rigidity aspect of the regulation is concerned with a bottle rocket that while placed in a container angled at 75 degrees relative to the ground actually is fired at a much lower angle to the ground because of a significant "droop" caused by a combination of a weighty rocket attached to a flexible stick. In other words, the bottle rocket does not proceed "directly," as measured from the angle of the launching device. Rockets not fired at sufficient angles to the ground may not achieve the height above ground necessary to prevent injury when the rocket explodes. In any event a flexible stick reduces control and, arguably, safety. Whether the reduced safety is significant is a matter for the agency, not the court.
[23] The court notes that clay plugs and any paper wrapping from a device are not included in the material collected for testing. Tr. 238.
[24] Any other interpretation of the regulation would have potentially dangerous consequences. Manufacturers could produce a device yielding a visual effect and couple with it material causing a huge explosion and "bang."
[25] Bivona v. Trollio, 758 F.Supp. 125 (E.D.N.Y. 1991), relied upon by Shelton, is distinguishable on its facts, and, to the extent that it appears to give the CPSC little deference in determining what products may be regulated under 16 C.F.R. § 1500.17(a)(3), the court declines to follow or adopt its analysis.
[26] Shelton relies on United States v. 7 Cases, Cracker Balls, 253 F.Supp. 771 (S.D.Tex.1966), and 15 U.S.C. § 1261(n), to support its position. This reliance is misplaced for several reasons. First, the regulation at issue was promulgated pursuant to 15 U.S.C. § 1262(b), which gives the CPSC the authority to issue "additional label requirements," not 15 U.S.C. § 1261(n). Shelton's argument also ignores the very generalized language of 16 C.F.R. § 1500.14(b)(7). It also ignores 16 C.F.R. § 1500.121(a)(2)(i), which defines a container as "the immediate package from which a hazardous substance may be dispensed and also any article ... which is necessary for the substance to function during actual use." See also 16 C.F.R. § 1500.14(b)(7)(xv) (making § 1500.121(a)(2)(i) applicable to mines and shells). Because Cracker Balls, supra, was decided before the regulations at issue here were promulgated, and because it involved very small balls about the size of a pencil eraser, whereas the product here involves balls about an inch and a half in diameter, the court finds it distinguishable and declines to follow it.
[27] Shelton contends that the CPSC's method of using 120 as the sample size is flawed because it assumes that all 120 items were available to be selected for testing. See Shelton's Post-Trial Brief at 22. However, using a sample size of 120 for figuring statistical inferences can never hurt it. In other words, using a theoretical sample size larger than the actual sample size can only result in a broader range of potential defective products in a given population size for a given confidence interval. Thus, if two out of the ten selected failed the rigidity test, the number failing the rigidity test can never fall below two even if all 120 were available for and were tested. See generally Tr. 275-76. The "lower limit" at a given confidence interval cannot get lower. Tr. 276.
[28] As Dr. Madsen testified at trial, a confidence interval is "a lower number and an upper number that are derived mathematically in such a way that if you were to repeatedly use this process, then a certain proportion of the time (90% if you use a "90% confidence interval," 95% if you use a "95% confidence interval") the true population proportion would be contained between the upper and lower limits." Tr. 269. If, using a 90% confidence level, the lower limit is 11% and the upper limit is 71%, 90% of the time the true number of defectives in a given population will fall somewhere between 11% and 71% of the total population (exactly where cannot be determined using a confidence interval). Tr. 272.
[29] For violations that occur after January 26, 1995, the maximums are $6,000 and $1,500,000. See 59 Fed.Reg. 66,253-24 (1994). For violations on or before that date, the maximums are $5,000 and $1,250,000. Id. The higher figures apply only to Products 16 to 19. See CPSC Post-Trial Brief at 10-11, n. 10.
[30] The court notes that 15 U.S.C. § 2069 contains identical language to that found in Section 1264(c)(1). A few reported cases cite to or discuss the pertinent language under § 2069. See, e.g., Aimone v. Walgreen's Co., 601 F.Supp. 507, 513 (N.D.Ill.1985) ("knowingly" includes "disregard [of] reasonable safeguards involved in distributing the [product] or act[ing] without knowledge ascertainable upon the exercise of due care."); Young v. Robertshaw Controls Co., 560 F.Supp. 288 (N.D.N.Y.1983); Advance Machine Co. v. Consumer Product Safety Comm'n, 666 F.2d 1166 (8th Cir.1981), reversing 510 F.Supp. 360 (D.Minn.1981).
[31] Shelton argues that because "[t]he all-important disjunctive `or' is not found within subsection B, but only between subsections A and B[,][t]he term `including' must therefore be interpreted as allowing due care as an element of presumed knowledge, but not to allow a lack of due care to serve as a substitute for knowledge." Shelton's Post-Trial Brief at 33-34 (footnotes omitted). The court is somewhat puzzled by Shelton's largely unexplained argument. Shelton did not reassert it at oral argument. The court's understanding of the language is that Shelton is presumed to know what a reasonable person would know or anything a reasonable person who exercised due care would know. The contorted statutory language practically equates "knowingly" with "carelessly" or "negligently."
[32] The CPSC argues that the testing that Shelton doeslooking at the fireworks for physical damage suffered in transit and sometimes shooting the fireworks off in the parking lotis not done to determine compliance with CPSC regulations. See CPSC's Post-Trial Brief at 16; CPSC Ex. 35 (Shelton Deposition) at 401 ("We go out and we test them by observing the boxes ... we look at them, inspect them to make sure they are not damaged in any fashion ... and then we would then begin to maybe shoot them if there is a question of the quality.") Tr. 373-74. Based on the record evidence, the court agrees with the agency. See, e.g., Tr. 373-77 (Shelton does not use, or at most occasionally uses, a stopwatch to measure fuse burn times, does not measure the amount of pyrotechnic composition in a fireworks device, does not measure a stick's rigidity and straightness, does not maintain any written records of any testing done, and only once in twenty years "flunked" a shipment of a product because of non-damaged product "malfunction"); CPSC Ex. 35 (Shelton Deposition) at 400-05, 413.
[33] Shelton actually argues that Products 5-7 were imported from Hop Kee, but the invoice for Product 7 names "Hangkee" as the importer. See CPSC Ex. 7A. The court's review of the record has turned up no evidence that Hangkee and Hop Kee are the same or related companies.
[34] There is some general evidence that no Chinese fireworks should simply be assumed to meet CPSC standards. Giving Shelton the benefit of doubtperhaps more than an experienced distributor should receiveI will not attribute such reasonable skepticism to Shelton in early 1992.
[35] Accordingly, Products 1-7 will not be considered in determining the amount of fine to be imposed. Based on the court's earlier ruling that Polaris was potentially liable only for Products 1-7, see supra, Polaris will not be assessed a fine in this matter. In addition, the court will also exclude from consideration in determining the amount of fine for Shelton Wholesale Products 9, 13 and 18, for which the CPSC has indicated it is not seeking a penalty. The court notes, however, that importation of these violative products may nevertheless have been "knowing." See text.
[36] The court is unimpressed by Shelton's argument that because pre-shipment testing was performed on Products 1-7, it made efforts to comply with CPSC regulations. As a preliminary matter, the court notes that it has ruled on other grounds that Shelton did not "knowingly" violate the FHSA in importing Products 1-7. See supra, text. The pre-shipment testing of Products 1-7 has no bearing on whether later violative products were "knowingly" imported. First, beyond the notation "Quality testing," see, e.g., CPSC Exs. 1A-7A, there is no indication in the record as to the nature of testing, if any, actually conducted. Whether testing for CPSC regulation compliance was conducted, or merely testing to ensure a quality product (straight labels, non-peeling paper, proper packaging, etc.) is unknown. Furthermore, based on Mr. Shelton's testimony, the pre-shipment testing of these products was not requested by Shelton but was forced upon it by the supplier. Indeed, Mr. Shelton testified that he did not request the testing. See CPSC Ex. 35 (Shelton Deposition) at 108, 510. Mr. Shelton also testified that "Most of my products, unless it was just a freak occurrence, they have not been AFSL tested." Id. at 390. Finally, the Product 1-7 testing was done when Shelton was, the court assumes (see supra, text), unaware of the possibility of compliance problems. After being put on notice that violations were possible, Shelton did not seek out third-party testing and third-party testing was not done, except perhaps in "freak occurrence[s]." For these reasons, the pre-shipment testing of Products 1-7 cannot immunize from a "knowingly" label later importations of violative products.
[37] Consider, for example, Mr. Kellner's testimony at trial that he was not aware of a single importer who has not had a product fail a CPSC test. Tr. 753. Consider also that Mr. Gayman testified that he was not aware of a single supplier whose products had not failed CPSC tests. Tr. 498. At trial the court expressed the view that Mr. Kellner's testimony supported a "theory that really all the importers of fireworks are knowingly importing defective products when it seems to be conceded they all know that some of their products will be challenged and will be found to be defective." Tr. 1070. The court asked whether this was "enough to show the knowing importation of defective products." Id. By omission, however, the CPSC has chosen not to argue in post-trial briefing that a knowing violation should be based on such a theory. This is consistent with the position it has apparently taken during this litigation that it simply wants fireworks importers to exercise some degree of care to minimize the importation of defective fireworks.
[38] For these same reasons, it is also no excuse to say, as Shelton does, that: (1) because the CPSC takes the position that it is not bound by non-CPSC test results relying on AFSL or supplier testing does an importer no good; or (2) because a fireworks device enters interstate commerce the minute it leaves for the United States a United States based self-testing program does an importer no good.
[39] Shelton argues that the products personally imported by Mr. Greg Shelton should be excluded when calculating the fine amount. For the reasons stated supra, this argument is unsound.
[40] For those tests that do not permit statistical inferences to be drawn based on the test results (e.g., the leakage test), a different method of calculating the fine would be appropriate. The court need not settle on the appropriate calculation, however, as the method discussed in the text functions adequately for all of the products involved in this action.
[41] This number is derived from adding the numbers contained in the low number column.
[42] Product 10 failed the label test. None of the individual balls in the sample bore the required label. Accordingly, all 43,200 devices are used in calculating the figures cited above (the court recognizes that 43,200 is probably a low number considering that each fireworks device probably had more than one small festival ball, but an error on the low side seems appropriate in this case).
[43] This assumes, perhaps contrary to fact, that there has been no corporate or business manipulation to avoid responsibility for a fine, or to use the company as a funnel for money diverted to Mr. Shelton.
[44] Judicial notice is taken of a $60,000 fine being paid in an agreed settlement of a similar controversy involving a St. Joseph, Missouri, company, with a roughly comparable sales volume. Missouri Lawyers Weekly, December 14, 1998.
[45] In order to avoid placing Shelton Wholesale in a poor cash flow position, the court has concluded that the annual installments should be paid to the United States at the conclusion of Shelton Wholesale's annual "busy season" of June and July.
[46] Testimony at trial indicated that Polaris is no longer actively used to import fireworks or conduct business. Tr. 369. Because its future status is not known, however, injunctive relief against it is nevertheless appropriate. Mr. Shelton testified that he believed Shelton Wholesale would continue to be used to import fireworks. Tr. 369.
[47] "Knowing" violations will be determined in any future contempt proceedings based on normal usage, not the special statutory definition. Since a reckless violation is more easily proved, but appears to be more difficult to establish than a statutory violation, it is not likely the parties will be exposed to contempt proceedings in a harassing manner.